# IN THE SUPREME COURT OF IOWA

No. 16–0575

Filed March 9, 2018

**STATE OF IOWA,**

 Appellee,

vs.

**K'VON JAMES HENDERSON,**

 Appellant.

_____

On review from Iowa Court of Appeals.

Appeal from the Iowa District Court for Black Hawk County, George Stigler, Judge.

A defendant appeals his conviction for first-degree robbery. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED WITH DIRECTIONS.**

John Audlehelm of Audlehelm Law Office, Des Moines, for appellant.

Thomas J. Miller, Attorney General, Martha E. Trout, Assistant Attorney General, Brian Williams, County Attorney, and Bradley Walz, Assistant County Attorney, for appellee.

**MANSFIELD, Justice.**

Can a getaway driver be convicted of first-degree robbery under the dangerous weapon alternative without knowing or intending that the robbery does involve a dangerous weapon? In our view, the answer to this question is no.

Here the defendant agreed to be the getaway driver for two others who were going to rob a pharmacy. The robbery took place, but the defendant never gave a ride to his compatriots because they were apprehended by the police before any rendezvous occurred.

Since a gun had been used, all three individuals were charged with first-degree robbery. Iowa Code § 711.2 (2015). After a joint trial, all three were convicted of that charge. The defendant appealed, arguing among other things that the record did not contain substantial evidence he knew a gun would be used in the robbery. The court of appeals affirmed.

On further review, we reverse the defendant's conviction for robbery in the first degree under Iowa Code section 711.2 and remand for entry of judgment and sentencing for robbery in the second degree under section 711.3. We hold that the defendant's conviction under an aiding and abetting theory required the State to prove the defendant not only participated in or encouraged the crime, but also *knew* of it, including the dangerous weapon element. Because the State failed to prove defendant had knowledge or intent of the use of a gun, a motion for judgment of acquittal on this basis would have been meritorious, and the defendant's trial counsel rendered ineffective assistance in failing to move for acquittal on this basis.

## I.  Facts and Procedural Background.

On February 9, 2015, the defendant K'von Henderson and his friends, Riley Mallett, Cody Plummer, Myles Anderson, and Dayton Nelson, were hanging out at Plummer's home.  At some point, Mallett suggested robbing the Greenwood Pharmacy in Waterloo.  The group agreed and spent the rest of the evening hashing out the details, including each participant's respective role in the robbery.  The initial plan was for Anderson and Mallett to enter the pharmacy, and Henderson and Nelson to be drivers.  Henderson would take Anderson and Mallett away from the scene in a white Oldsmobile, and Nelson would drive the drugs and money away in a separate vehicle—a black BMW.

The parties also discussed how they would perpetrate the robbery itself.  According to Nelson,[1] they decided not to use a gun.  Instead, they intended to use a threatening note.

> Q. Now, when you made this plan to rob this pharmacy, you know very well that there was supposed to be no guns at all involved in this robbery, correct?  A.  Yes, sir.
>
> Q. That was made certain at this house, Cody Plummer's house?  A.  Yes, sir.
>
> Q. And it's fair to say that nobody was supposed to even get hurt in this robbery, correct?  A.  Yes, sir.
>
> . . . .
>
> Q. In doing so, during that planning, how were you— how were the people that entered the pharmacy going to attempt to get the employees at Greenwood Pharmacy to give them anything without showing a weapon or without using any kind of force.  A.  A note.
>
> Q. And what was the nature of the note going to be?  A.  Just so you didn't have to use anything else.

---

[1]Nelson testified for the prosecution at trial.

The following day, February 10, was a flurry of activity and communication for the group. Cellphone records revealed that the parties called each other frequently that day, and the timing of the calls coincided with later trial testimony as to when the men were together and when they were apart. Mallett texted Anderson in the early hours of the morning to confirm that both had obtained masks for the robbery. Approximately an hour and a half before the robbery, Anderson backed out of his role as one of the two entrants into the pharmacy. Plummer took his place.

The group brought two vehicles to the pharmacy parking lot: the BMW and the Oldsmobile. Mallett drove Anderson and Plummer in the BMW, while Nelson and Henderson went separately in the Oldsmobile. After everyone arrived in the pharmacy parking lot, Nelson exited the Oldsmobile and got into the driver's seat of the BMW. Henderson split off from the group and drove the Oldsmobile by himself to the meeting point where he was supposed to pick up Plummer and Mallett after the robbery.

According to Nelson, after Henderson had left, and immediately before Plummer and Mallett were to enter the pharmacy, Anderson produced a firearm similar to a police-issued firearm. Anderson referred to this gun as "Billy" and had evidently acquired it in a previous robbery.

Nelson testified at trial that all of the group members were aware Anderson possessed this gun, although he did not regularly carry it. Nelson further testified that he did not know that a gun was going to be used until Anderson pulled out "Billy." Nelson observed Anderson handing the gun out the car window of the BMW. Nelson could not see who Anderson passed the gun to, although only Mallett and Plummer were outside the vehicle at that time.

Shortly before 9:00 p.m., Mallett and Plummer entered Greenwood Pharmacy. Both men wore masks, and Mallett wore distinctive "clown pants," which were black with large white stars on them. Pharmacy employees testified that both men also appeared to be carrying guns, although one appeared to be a toy. Once inside, Mallett moved to the back of the pharmacy and provided a handwritten note to the pharmacist that read, "Give all the pain pill[s], all the Xanax and all the Promethazine [and] Codeine before I shoot this bitch up." Mallett pointed his gun—i.e., "Billy"—at the pharmacist's head to direct him around the store. The pharmacist testified that the gun "definitely looked metal. It looked like a weapon that a police would have." Mallett ordered the pharmacist to hand over supplies of various drugs.

Meanwhile, Plummer took $70 from the cash register at the front, although the employee there believed Plummer's gun wasn't real: "It had a little orange around it." Plummer then joined Mallett at the rear of the pharmacy. When the robbers ordered a technician to empty the remaining register, she triggered the silent alarm.

Once Mallett and Plummer had obtained their loot, they fled through the back exit of the pharmacy. Nelson was there to meet them, and they deposited the items they had stolen into the trunk of the BMW. Nelson and Anderson then headed in the BMW to Plummer's house.

In accordance with the plan, Mallett and Plummer went on foot to meet Henderson at the chosen rendezvous spot. However, by this time, law enforcement officers were swarming the area, and no rendezvous occurred. Mallett was eventually caught in a treehouse in a nearby neighborhood. He had discarded his distinctive "clown pants"—later found by the police nearby—and wore only shorts and a hooded

sweatshirt. Plummer was apprehended running through the neighborhood with only one shoe, having lost the other while fleeing.

Meanwhile, Henderson drove to Plummer's house where he met Nelson and Anderson, and the three of them proceeded to Nelson's house. There, they divided some of the proceeds of the robbery and hid a purse filled with the remaining stolen drugs under Nelson's mother's bed. Anderson then went to his own home, where he was later taken into custody by police.

At Nelson's home, Henderson ran into Nelson's younger brother. Henderson told the brother that if anyone asked, he should say Henderson and the others had been hanging out with him all evening. Soon, the police arrived at Nelson's house and knocked on the door. As Nelson answered the door, his dogs bolted out. Henderson and Nelson ran after the dogs but were quickly apprehended by the police.

The officer who detained Henderson found approximately $70 and a wad of tinfoil containing Xanax in his pocket. Although Henderson had a valid prescription for Xanax, Henderson accused the officer of planting the packet in his pocket. Henderson's sister later testified at trial that the pills Henderson normally took were of a different color than those recovered from his pocket on the night of the robbery.

When questioned by police, Henderson initially claimed he had been with a friend getting his taxes done during the day and ended up at the Nelson residence in the evening where he had stayed. He ultimately admitted to leaving the Nelson house, but claimed that he had spent the time just driving around.

On February 20, a trial information was filed in the Iowa District Court for Black Hawk County charging Henderson, Anderson, Plummer, and Mallett with first-degree robbery, a class "B" felony. *See* Iowa Code

§ 711.2. Anderson pled guilty to first-degree robbery. Nelson entered into an agreement to plead guilty to first-degree theft and conspiracy to commit first-degree robbery, both class "C" felonies, and to testify against the remaining defendants. *See id.* § 706.3(1); *id.* § 714.2(1). Henderson went to trial jointly with Plummer and Mallett.

A first trial commenced on November 24 but resulted in a mistrial. Subsequently, a second jury was impaneled on February 9, 2016, and the presentation of evidence began on February 10.

The State's main witness was Nelson, who testified to the entire series of events leading up to and past the robbery. Other prosecution witnesses included employees of the pharmacy, police officers who responded to and investigated the robbery, Plummer's girlfriend who overheard some of the planning for the robbery on February 9, 2015, Nelson's mother, and Nelson's younger brother. Surveillance video from the pharmacy depicting the robbery was also played for the jury.

After the State rested, all three defendants moved for judgment of acquittal. *See* Iowa R. Crim. P. 2.19(8). Henderson's motion urged that Nelson's testimony lacked corroboration. Specifically, his counsel argued,

> [T]here is simply no corroboration of Mr. Nelson's testimony. Therefore, there is no jury question presented and we'd ask the Court to dismiss the charge of Robbery in the First Degree against Mr. Henderson as a matter of law.

The court denied all three motions.

In addition to first-degree robbery, the jury was instructed on the lesser included offenses of second-degree robbery and assault. Instruction No. 23 stated,

> The State must prove all of the following elements of Robbery in the First Degree:

1. On or about the 10th day of February, the defendant K[']von Henderson, or a person the defendant aided and abetted or engaged in joint criminal conduct, had the specific intent to commit a theft.

2. To carry out his intention or to assist in escaping from the scene, with or without the stolen property, the defendant, or a person the defendant aided and abetted or engaged in joint criminal conduct, committed an assault on Marcie Mangin or Diane Petersen or Stephen Burk or Wesley Pilkington.

3. The defendant, or a person the defendant aided and abetted, was armed with a dangerous weapon.

If the State has proved all of the elements, the defendant is guilty of Robbery in the First Degree. If the State has proved elements numbers 1 and 2, but not element 3, the defendant is guilty of Robbery in the Second Degree. If the State has proved only element no. 2, the defendant is guilty of Assault. If the State has proved only element no. 1 or none of the elements, the defendant is not guilty.

The jury also received a general instruction regarding aiding and abetting. Thus, Instruction No. 18 stated,

"Aid and abet" means to knowingly approve and agree to the commission of a crime, either by active participation in it or by knowingly advising or encouraging the act in some way before or when it is committed. Conduct following the crime may be considered only as it may tend to prove the defendant's earlier participation.

. . . .

The crimes charged require a specific intent. Therefore, before you can find the defendant "aided and abetted" the commission of the crime, the state must prove the defendant(s) either has such specific intent or "aided and abetted" with the knowledge the others who directly committed the crime had such specific intent. If the defendant(s) did not have the specific intent, or knowledge the other had such specific intent, he is not guilty.

On February 17, 2016, the jury returned verdicts finding all three defendants guilty of first-degree robbery.

On February 25, Henderson filed from jail a pro se handwritten motion for a new trial, alleging several deficiencies in his trial and representation, including the lack of corroboration of Nelson's testimony. On February 29, Henderson supplemented this motion with another handwritten jail note which said in part,

> In trial the state and it's witness' never mentioned I had any knowledge what-so-ever that there was going to be a weapon used in the robbery at Greenwood Pharmacy nor did the state or it's witness' ever mention I seen the robbery the night of the incident. I feel I was wrongfully charged and convicted because to be charged with 1st degree robbery I would've have had to known that there was going to be a real weapon or even a weapon at all, and that was not brought up at trial at all.

On March 24, the district court heard and overruled Henderson's motion for new trial. As to Henderson's knowledge of a gun, the court indicated there had been trial testimony that "there was a weapon produced, handed out of the car by Myles Anderson to either Mr. Mallett or Mr. Plummer and that [Henderson] had full knowledge of that."

Henderson spoke up in the courtroom and disagreed. He asked, "And when—where did they say that in the trial?" The court replied that it didn't want to argue the point, but that was what the record reflected. Henderson disagreed again and reiterated, "[T]hey have no proof that I knew knowledge of the weapon being involved . . . . But I am still getting First Degree Robbery though."

As required by Iowa law, the district court sentenced Henderson for first-degree robbery to twenty-five years in prison, subject to a seventy percent mandatory minimum period of incarceration. *See* Iowa Code §§ 902.9(1)(*b*), .12(5).

Henderson appealed. The appellate brief filed by his counsel raised a single issue—insufficient evidence or alternatively ineffective

assistance of counsel based on failure to move for judgment of acquittal due to absence of proof that Henderson was aware a dangerous weapon would be used in the robbery.

Henderson also filed a pro se brief. In addition to the dangerous weapon issue, Henderson's pro se brief raised additional ineffective-assistance claims relating to the waiving of reporting of voir dire, failure to obtain the admission of exculpatory out-of-court statements made by Henderson's codefendants, failure to take the deposition of Nelson's younger brother, and failure to object to trial evidence that Anderson had previously stolen firearms, including handguns.

We transferred the case to the court of appeals, which affirmed Henderson's conviction. In rejecting Henderson's claim that he could not be found guilty of first-degree robbery because the State had not proved he had knowledge or intent a dangerous weapon would be used, that court said,

> Henderson was involved in the planning and execution of the robbery. He was there when the note threatening to "shoot this bitch up" was written. "All persons concerned in the commission of a public offense, whether they directly commit the act constituting the offense or aid or abet its commission, shall be charged, tried, and punished as principles." Iowa Code § 703.1 (2015). Nelson testified they all knew a gun would be used. Whether Henderson knew or did not know a gun would be involved makes no difference.

The court also denied relief on the remaining issues raised in Henderson's pro se brief.

We granted Henderson's application for further review.

## II. Standard of Review.

We review de novo claims of ineffective assistance of counsel. *State v. Harris*, 891 N.W.2d 182, 185 (2017). However, when the claim is that counsel was ineffective in failing to move for judgment of acquittal, this

implicates the question whether such a motion would have been meritorious, which turns on the sufficiency of evidence. *Id.* at 186. We have said that "no reasonable trial strategy could permit a jury to consider a crime not supported by substantial evidence." *State v. Schlitter,* 881 N.W.2d 380, 390 (Iowa 2016); *see also State v. Schories,* 827 N.W.2d 659, 664–65 (Iowa 2013). In making determinations on the sufficiency of the evidence, we view the evidence in the light most favorable to the State and will consider whether there is substantial evidence supporting the defendant's conviction. *See State v. Huser,* 894 N.W.2d 472, 490 (Iowa 2017). Evidence is substantial if it would convince a rational trier of fact the defendant is guilty beyond a reasonable doubt. *State v. Ortiz,* 905 N.W.2d 174, 180 (Iowa 2017); *State v. Reed,* 875 N.W.2d 693, 704–05 (Iowa 2016).

### III. Analysis.

Henderson's application for further review raised only whether there was sufficient evidence to conclude Henderson knew or intended a dangerous weapon would be used in the robbery. We will exercise our discretion to let the court of appeals decision stand as the final decision on the remaining issues raised on appeal. *See State v. Martin,* 877 N.W.2d 859, 865 (Iowa 2016). Henderson asks that the sufficiency of this evidence be addressed either directly or, if necessary, through the pathway of ineffective assistance of counsel.

At the close of the State's case, Henderson's counsel moved for a judgment of acquittal based on a claimed lack of corroboration of Nelson's accomplice testimony. He made no argument that the State had failed to prove Henderson's knowledge of a dangerous weapon. We have held a defendant's motion for judgment of acquittal only serves to preserve error on a claim of insufficient evidence for appellate review in a

criminal case if it "identifies the specific grounds raised on appeal." *See State v. Brubaker*, 805 N.W.2d 164, 170 (Iowa 2011) (quoting *State v. Truesdell*, 679 N.W.2d 611, 615 (Iowa 2004)); *see also State v. Ross*, 845 N.W.2d 692, 700 (Iowa 2014) ("Trial counsel is required to make a specific objection in his or her motion for judgment of acquittal in order to preserve error."). Because the motion did not mention the deficiency in proof now raised on appeal, we find that error was not preserved. *See Brubaker*, 805 N.W.2d at 170. However, as already discussed, Henderson argues in the alternative that his trial counsel was ineffective and we can reach the sufficiency-of-evidence issue that way.

Contrary to the district court's observations at the sentencing hearing, we do not believe the record contains evidence that Henderson saw or knew about Anderson handing the gun through the window of the BMW to either Plummer or Mallett. Nelson stated that Henderson was not with them at that point. In fact, in its appellate brief the State concedes that "Henderson had already driven to his spot."

Likewise, we do not believe the record supports the court of appeals' statements that Henderson was present when the note threatening to "shoot this bitch up" was written or that Nelson testified everyone knew a gun would be used. To the contrary, Nelson testified (1) the plan on February 9 was not to use a gun, (2) the note was written later, and (3) Nelson himself learned for the first time a gun would be used when Anderson handed the firearm to Plummer or Mallett just before they entered the pharmacy.

The State, however, insists the test is foreseeability rather than knowledge: "Contrary to Henderson's claim, the issue is not whether he knew a gun would be used in the robbery to establish his guilt but whether it was foreseeable that a gun would be used." The State also

points to Nelson's testimony that the group already knew Anderson possessed a gun and maintains the jury didn't have to accept Nelson's testimony that the plan was not to use a gun. The State adds, "It makes little sense that the young men would plan a robbery at a pharmacy with four employees present and not have a weapon when one was readily available."

We do not agree that foreseeability, as opposed to knowledge or intent, is enough to sustain an aiding-and-abetting conviction. This conflates aiding and abetting with joint criminal conduct. We have held that "[j]oint criminal conduct 'contemplates *two* acts—the crime the joint actor has knowingly participated in, and a second or resulting crime that is unplanned but could reasonably be expected to occur in furtherance of the first one.'" *State v. Tyler*, 873 N.W.2d 741, 752 (Iowa 2016) (quoting *State v. Rodriguez*, 804 N.W.2d 844, 852 (Iowa 2011)). Here, however, only one crime occurred—the robbery itself.

Aiding and abetting requires only a single crime, but the State must prove the defendant "knew of the crime at the time of or before its commission." *State v. Tangie*, 616 N.W.2d 564, 574 (Iowa 2000). As we have held,

> To sustain a conviction on the theory of aiding and abetting, the record must contain substantial evidence the accused assented to or lent countenance and approval to the criminal act either by active participation or by some manner encouraging it prior to or at the time of its commission. The State must prove the accused knew of the crime at the time of or before its commission. However, such proof need not be established by direct proof, it may be either direct or circumstantial.

*Id.* (citation omitted). "Knowledge is essential; however, neither knowledge nor presence at the scene of the crime is sufficient to prove aiding and abetting." *State v. Neiderbach*, 837 N.W.2d 180, 211 (Iowa

2013) (quoting *State v. Hearn*, 797 N.W.2d 577, 580 (Iowa 2011)). "The guilt of a person who aids and abets the commission of a crime must be determined upon the facts which show the part the person had in it . . . ." Iowa Code § 703.1.

To restate the matter, under a joint criminal conduct theory, the question is whether the charged, later crime was foreseeable, regardless of whether the defendant had the specific intent to commit that crime or knowledge that his or her compatriot was committing the crime. *See State v. Countryman*, 572 N.W.2d 553, 562 (Iowa 1997) (finding that "[f]rom the joint conduct in committing the first crime it follows that [the defendant] can be found vicariously responsible for other foreseeable crimes of a confederate" and rejecting the notion that "she should not be convicted without proving she had a *mens rea* to commit murder"). The same is not true under the theory of aiding and abetting. There the defendant must have "knowingly aided the principal" in committing the crime. *State v. Satern*, 516 N.W.2d 839, 843 (Iowa 1994).

Therefore, in the context of a first-degree robbery prosecution under the dangerous weapon alternative, the State must prove the alleged aider and abettor had knowledge that a dangerous weapon would be or was being used. *See* Iowa Code § 711.2 ("A person commits robbery in the first degree when, while perpetrating a robbery, the person . . . is armed with a dangerous weapon."). Otherwise, the aider and abettor may have knowledge or intent to commit *a* robbery, but not *first-degree* robbery.

Federal law follows this approach: "We have previously found that intent requirement [for aiding and abetting] satisfied when a person actively participates in a criminal venture with full knowledge of the circumstances constituting the charged offense." *Rosemond v. United*

*States*, 572 U.S. ___, ___, 134 S. Ct. 1240, 1248–49, 1251 (2014) (holding that to be convicted of aiding and abetting the crime of using a firearm during drug trafficking, the defendant "needed advance knowledge of a firearm's presence"). "[A]n aiding and abetting conviction requires not just an act facilitating one or another element, but also a state of mind extending to the entire crime." *Id.* at 572 U.S. at ___, 134 S. Ct. at 1248. Hence, to sustain an armed robbery conviction based on aiding and abetting under federal law, the defendant must have known a confederate would be armed. *See United States v. Akiti*, 701 F.3d 883, 887 (8th Cir. 2012) (upholding the conviction of a getaway driver for aiding and abetting armed robbery because "a reasonable jury could have concluded Akiti knew Tang would be armed during the robbery"); *United States v. Easter*, 66 F.3d 1018, 1024 (9th Cir. 1995) ("A rational jury could infer, based upon the conversation the night before the robbery, and Lea's opportunity on the way to the bank to overhear a discussion about who was going to carry the guns, and to see at least one of the guns, that Lea knew the robbery was going to be an armed one."); *United States v. Grubczak*, 793 F.2d 458, 462 n.1 (2d Cir. 1986) (noting "that in a prosecution for aiding and abetting armed bank robbery, the government must establish not only that the defendant knew that a bank was to be robbed and became associated and participated in that crime, but also that the defendant 'knew that [the principal] was armed and intended to use the weapon, and intended to aid him in that respect'" (alteration in original) (quoting *United States v. Longoria*, 569 F.2d 422, 425 (5th Cir. 1978))).

Most state jurisdictions appear to follow the same approach. *See Robinson v. United States*, 100 A.3d 95, 106–08 (D.C. 2014) ("Actual knowledge of the weapon is required . . . . We perforce hold that the trial

court in the present case erred by instructing the jury, in response to its inquiries, that a defendant could be convicted of second-degree burglary while armed as an aider and abettor if she had reason to know the principal perpetrator of that crime was armed."); *Hemphill v. State*, 531 S.E.2d 150, 151–52 (Ga. Ct. App. 2000) (approving a pattern jury instruction requiring "that the defendant had knowledge that the crime of armed robbery was being committed" and noting that the defendant— who was the driver—"knew that his accomplices had guns"); *Commonwealth v. Brown*, 81 N.E.3d 1173, 1182 (Mass. 2017) ("In this case, where the predicate felonies were attempted armed robbery and armed home invasion, the Commonwealth also was required to prove that the defendant knew that one of his accomplices possessed a firearm."); *Brooks v. State*, 180 P.3d 657, 662 (Nev. 2008) ("Here, the State presented evidence that Brooks drove the vehicle to and from Davis's home and knew the location of Davis's discarded purse. However, it is unclear whether Brooks had knowledge of the other offender's use of the gun. . . . [T]he State must also prove that Brooks had knowledge of the use of the deadly weapon."); *State v. Bohannan*, 503 A.2d 396, 399 (N.J. Super. Ct. App. Div. 1986) ("[A]n accomplice will be guilty of armed robbery, regardless of whether he actually possessed or used a weapon, only where he had the purpose to promote or facilitate an armed robbery."); *Wyatt v. State*, 367 S.W.3d 337, 341 (Tex. App. 2012) ("We agree with appellant that even if the jury believed that appellant participated in the robbery by serving as Tolbert's getaway driver and sharing in the proceeds of the robbery, the record contains no evidence that appellant ever was aware that the firearm 'would be, was being, or had been used or exhibited during the offense.'"); *State v. Wimpie*, No. 01-1634-CR, 2002 WL 234238, at *3 (Wis. Ct. App. Feb. 19, 2002) (per curiam) (affirming Wimpie's conviction for armed robbery

because "a jury could conclude that Wimpie knew that Martin claimed to have a gun"). *But see State v. McCalpine*, 463 A.2d 545, 551 (Conn. 1983) (finding the state did not have to prove intent to use a deadly weapon in order to establish accessory liability); *People v. Young*, 318 N.W.2d 606, 607 (Mich. Ct. App. 1982) (determining it was not necessary that "the defendant knew that Bennett was armed" but only that "carrying or using a weapon to commit the robbery was fairly within the scope of the common unlawful enterprise"); *State v. Ward*, 473 S.W.3d 686, 692–93 (Mo. Ct. App. 2015) (holding that under Missouri law, a defendant may be convicted under a theory of accomplice liability for first-degree robbery if the use of a firearm could be "reasonably anticipated").

Of course, knowledge can be proved by circumstantial evidence. *See State v. McDowell*, 622 N.W.2d 305, 308 (Iowa 2001). The State notes the following: (1) Henderson knew Anderson possessed a weapon (although he didn't regularly carry it with him), (2) it would make little sense for two people to try to rob a store staffed by four people without a gun if one was available, and (3) the jury didn't have to believe Nelson's testimony that the plan was not to use a gun and the plan only changed shortly before the robbery after Henderson had left the group.

On our review of this record, we hold a reasonable jury could not have found beyond a reasonable doubt that Henderson knew a gun would be used. Notably, the prosecutor argued to the jury only that the use of a gun was "foreseeable." While the jury did not have to believe everything Nelson said, there was no contrary evidence as to how the robbery plan developed. It isn't implausible that a group of young men would think that two of them without using a gun could successfully rob a pharmacy staffed by two men and two women. *See, e.g., State v. Copenhaver*, 844 N.W.2d 442, 445–46 (Iowa 2014) (describing unarmed

bank robbery committed by a lone individual while two tellers and two bank officers were in the bank). One good reason not to use a firearm is Iowa's 17.5 year mandatory minimum prison term for first-degree robbery, one of the most severe in the country. *See* Iowa Code § 902.12(5); Ed Mansfield & Julia Steggerda-Corey, *Mandatory Minimum Sentencing: A Closer Look at Iowa* 17–20 tbl.4 (unpublished manuscript) (on file with authors).

Because there was insufficient evidence to convict Henderson of first-degree robbery as an aider and abettor due to a failure of proof on the dangerous weapon element, that conviction must be set aside. The question remains what to do next. The jury necessarily found sufficient evidence to establish the other elements of first-degree robbery, namely, intent to commit a theft and assault. The jury was instructed in Instruction No. 23 that if they found only those two elements, and not the dangerous weapon element, they should find the defendant guilty of the lesser included offense of second-degree robbery.[2] Accordingly, the appropriate remedy is to remand the case for the district court to enter judgment and sentence on the lesser included offense of robbery in the second degree. *See Ortiz,* 905 N.W.2d at 183; *State v. Morris*, 677 N.W.2d 787, 788–89 (Iowa 2004); *State v. Pace,* 602 N.W.2d 764, 773 (Iowa 1999).

### IV. Conclusion.

For the foregoing reasons, we reverse Henderson's conviction and sentence on first-degree robbery and remand for entry of conviction and sentence on second-degree robbery.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED WITH DIRECTIONS.**

---

[2]This case predates the legislation that established third-degree robbery. *See* 2016 Iowa Acts ch. 1104, § 4 (codified at Iowa Code § 711.3A (2017)); *Ortiz,* 905 N.W.2d at 180.