# IN THE COURT OF APPEALS OF IOWA

No. 18-2003
Filed May 13, 2020

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**DEVARIO D. TALLEY,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Scott County, Joel W. Barrows, Judge.

A defendant appeals his convictions for eluding and three counts of child endangerment. **REVERSED AND REMANDED FOR NEW TRIAL.**

Martha J. Lucey, State Appellate Defender, and Melinda J. Nye, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Timothy M. Hau, Assistant Attorney General, for appellee.

Considered by Tabor, P.J., and May and Greer, JJ.

**TABOR, Presiding Judge.**

Devario Talley challenges his convictions for eluding and child endangerment. He contends the State did not offer enough evidence to merit an instruction on the alternative theory of aiding and abetting. Even viewing the evidence in the light most favorable to the State, the record contains insufficient proof that Talley knowingly advised or encouraged his brother to lead Davenport police on a high-speed chase, placing child passengers at risk. Because the jury returned general verdicts, we must reverse and remand for a new trial.

## I.      Facts and Prior Proceedings

Rock Island Police Officer Philip Ledbetter was driving an unmarked vehicle when he asked fellow officer Luke Serra to pull over a tan Chevrolet Suburban. The Suburban's driver, Talley, was using his cell phone. Officer Serra signaled Talley to stop. Talley complied by pulling into a parking lot but kept his engine running. Officer Serra approached the driver's window and asked for Talley's license and proof of insurance. Talley handed over his driver's license and told Officer Serra that he had proof of insurance saved on his phone. During this exchange, video footage from Officer Serra's body camera showed the legs of another individual sitting in the front passenger seat.

While waiting for Talley to find his proof of insurance, Officer Serra stood outside Talley's vehicle. Still communicating with dispatch, Officer Serra opened the driver's door and asked Talley to step out. Talley shook his head, engaged the gear lever with his left hand, and sped off. The driver's door was still open as Talley made a sharp right turn onto the adjacent road. In that turn, Talley's wallet

fell from the Suburban.  After watching the vehicle speed off, Officer Serra picked up Talley's wallet from the road.

Having watched the encounter from his unmarked pickup, Officer Ledbetter followed Talley.  Officer Ledbetter later testified that Talley was speeding and driving erratically in Rock Island before he lost sight of Talley's vehicle for a few seconds.  When Officer Ledbetter regained sight of the Suburban, Talley was driving toward the Centennial Bridge, which crossed the Mississippi River into Iowa.

To avoid any more police attention, Talley slowed down and obeyed traffic laws on the bridge.  Obtaining permission from his supervisors, Officer Ledbetter followed Talley into Davenport.  He called dispatch who notified the Davenport police that Talley had run from the police and was heading into their jurisdiction. Officer Ledbetter gave up tailing Talley when the Suburban was about two car lengths ahead of him and Davenport police were three cars lengths behind.

As Davenport police intercepted the Suburban, Corporal Nathan Schroeder turned on his lights and siren near Fifteenth and Ripley Street.  He recalled the vehicle traveling "at a high rate of speed" southbound down an alley.  The corporal continued the pursuit as the Suburban returned to the city streets, eventually turning northbound, the wrong way, onto Harrison Street.  On the border of Vander Veer Park, the Suburban veered onto the sidewalk for a bit before returning to Harrison Street.  Corporal Schroeder recalled reaching speeds between 80 and 90

miles per hour several times during the chase.[1]  After turning off Harrison Street onto Gaines Street, the Suburban ran two stop signs.  Eventually, it pulled into an alley off Division Street.

By the time Corporal Schroeder caught up, Officer Joseph Dorton was already on the scene.  When Officer Dorton first saw the Suburban driving down Division Street, it was "[v]ery erratic, that's why officers that were on the pursuit couldn't keep up with it, just because of how fast it was going."  As Officer Dorton pulled up behind the Suburban in the alley, he noticed "the vehicle was actually smoking . . . so that's what caught our eye."

Next, both sets of officers approached the Suburban on foot.  Because of its tinted windows, they couldn't tell if any occupants had fled but prepared to conduct "a felony stop" with weapons drawn.  To their surprise, what the officers saw were two little girls climb out of the back seat, the second holding a baby.  After holstering their weapons, the officers found the front seat empty.  Officer Dorton described the children as "very, very scared."  The three backseat passengers were Talley's daughters, ages eleven, six, and one.  The eldest child complained of head pain.  She had not been wearing a seatbelt and hit the roof of the Suburban as it careened through Davenport's streets.

When an officer asked the six-year-old who was driving, she said her uncle.  She explained "her daddy got into a white car with two girls."  The uncle was Queshan Harris, Talley's younger brother.  Harris testified that after they drove

---

[1] Corporal Schroder worried about the pursuit's threat to public safety: "It was right in the middle of the busiest kind of the rush hour time where people are coming from work, coming home.  It was the busiest time of the day."

over the bridge into Iowa, Talley stopped the Suburban behind the YMCA. Harris said Talley "got out and got in the car with two females, and I started to drive." Talley's three little girls remained seated in the back of the Suburban.

Harris testified to heading up the hill toward Harrison Street. By his account, as he was "coming down Ripley and turned into an alley, . . . they kind of tried to swarm me, so I got scared and kept driving." Harris admitted driving the wrong direction down one-way streets and reaching speeds of more than twenty miles above the posted limit. Shortly after finding the children in the abandoned Suburban, Corporal Schroeder located their uncle hiding in a detached garage down the alleyway. Police arrested Harris for child endangerment and eluding. Before Talley's trial, Harris pleaded guilty to those charges.

Unlike the quick arrest of Harris, Davenport police did not track down Talley on March 27, 2018, the day of the chase. The State secured an arrest warrant for Talley on April 3 but did not take him into custody until June. The trial information, filed in July, charged him with one count of eluding or attempting to elude a law-enforcement vehicle in violation of Iowa Code section 321.279(2) (2018). The State also charged Talley with three counts of child endangerment in violation of section 726.6(7)—one count for each of his daughters present for the eluding.

At trial, the State introduced into evidence the recording of a phone call Harris placed from jail to Talley before his arrest. In the call, Harris complains about difficulty obtaining pretrial release. Talley tells him: "They mad as hell . . . , you been driving around Davenport for thirty minutes running from the police. They mad." During the call, Harris acknowledged driving the Suburban. Talley joked about other people calling him mid-chase to comment on his erratic driving in the

neighborhood, but he replied: "no that was lil' bro."  Harris described how one of his nieces entreated from the backseat: "I know uncle this is the wrong time to ask, but if you get away from the police, can you take me to use the bathroom?"  Talley guffawed: "You scared the piss out of my baby."

The State also introduced two jail phone conversations recorded after Talley's arrest.  In the first conversation, Talley asks the woman on the line to get Harris to "take the charges" for him.  In the second conversation, the woman says she "talked to Queshan and he took the charge, he took a plea."  Talley replies: "Tell him I said thanks."

At the close of trial, the jury returned general verdicts, convicting Talley on all four counts from which he now appeals.

## II.     Scope and Standards of Review

We review a challenge to the sufficiency of the evidence to submit a jury instruction for correction of legal error.  *State v. Neiderbach*, 837 N.W.2d 180, 190 (Iowa 2013).  When the disputed instruction defines the parties to a crime under chapter 703, and thus adds a vicarious-liability alternative to the marshalling instructions, we review for substantial evidence.  *See State v. Smith*, 739 N.W.2d 289, 293 (Iowa 2007).  We find substantial evidence for the alternative theory if, when viewed in the light most favorable to the State, the proof could convince a rational jury the defendant is guilty of the charged crimes beyond a reasonable doubt.  *Id.*

## III.     Analysis

On appeal, Talley raises two issues.  One, did the district court err by instructing the jury on the theory of aiding and abetting?  Two, was Talley's trial

counsel ineffective for not requesting a jury instruction on territorial jurisdiction? Because our resolution of the first issue is dispositive, we need not address the second claim.

Out of the gate, the State did not advance an aiding-and-abetting theory. The trial information alleged Talley acted as the principal in the eluding and child endangerment counts. At trial, after defense counsel moved for judgment of acquittal, the prosecutor asserted: "A reasonable trier of fact could certainly conclude from this information that Mr. Talley was in fact the person driving, and was the person who began leading all of the officers in Davenport in Scott County on this high-speed chase which has been testified to by multiple officers."

In fact, not until the parties were assembling the jury instructions did the State suggest it was pursuing a theory of aiding and abetting. The prosecutor asked for the aiding-and-abetting instruction, explaining: "we have testimony from Mr. Harris that two different people were involved in the commission of this crime." Over a defense objection,[2] the district court ruled: "the evidence presented so far justifies the instruction for aiding and abetting."

After that ruling, the jury received this aiding-and-abetting instruction:

All persons involved in the commission of a crime, whether they directly commit the crime or knowingly "aid and abet" its commission, shall be treated in the same way.
"Aid and abet" means to knowingly approve and agree to the commission of a crime, either by active participation in it or by knowingly advising or encouraging the act in some way before or when it is committed. Conduct following the crime may be considered only as it may tend to prove the defendant's earlier

---

[2] The State argues the defense objection was not specific enough to preserve error. We disagree. Defense counsel preserved error by objecting to the prosecutor's proposed aiding-and-abetting instruction and by obtaining the court's decision that sufficient evidence supported that alternative theory.

participation. Mere nearness to, or presence at, the scene of the crime, without more evidence, is not "aiding and abetting". Likewise, mere knowledge of the crime is not enough to prove "aiding and abetting".

The guilt of a person who knowingly aids and abets the commission of a crime must be determined only on the facts which show the part he has in it, and does not depend upon the degree of another person's guilt.

If you find the State has proved a defendant directly committed the crime, or knowingly "aided and abetted" other person or persons in the commission of the crime, then the defendant is guilty of the crime charged.

That uniform instruction reflected the aiding-and-abetting definition in Iowa Code section 703.1.

Under the marshaling instruction for eluding, the State had to prove Talley "drove a vehicle" and "willfully failed to bring the motor vehicle to a stop or otherwise eluded a marked official law enforcement vehicle driven by a uniformed peace officer after being given a visual and audible signal to stop." *See* Iowa Code § 321.279(2). Alternatively, under its aiding-and-abetting theory, the State had to show Talley knowingly advised or encouraged Harris to do those acts.

Under the marshalling instructions for child endangerment, the State had to prove Talley "was the parent or person having custody or control" of the children, the children were under fourteen, and he "acted with knowledge that he was creating a substantial risk to [their] physical, mental, or emotional safety." *See id.*§ 726.6(7). Alternatively, under its aiding-and-abetting theory, the State had to show Talley knowingly advised or encouraged Harris to do those acts.

Talley contends the State presented insufficient evidence to support the aiding-and-abetting instruction. In Talley's estimation, the record lacks substantial

evidence that he "assented to or lent countenance and approval to" Harris's acts of eluding or child endangerment.[3]

It is fundamental that someone convicted of aiding and abetting must be aware of the offense "at the time of or before its commission." *See State v. Henderson*, 908 N.W.2d 868, 876 (Iowa 2018) (quoting *State v. Tangie*, 616 N.W.2d 564, 574 (Iowa 2000)). Knowledge of the crime is essential. *Neiderbach*, 837 N.W.2d at 211. But neither knowledge nor presence at the scene of the crime can alone prove aiding and abetting. *See Henderson*, 908 N.W.2d at 876.

To sustain Talley's convictions on the theory of aiding and abetting, the State must show he advised or encouraged Harris to elude the Davenport police—and thereby endanger the children—before or during the chase. But the State offered no evidence that both Talley and Harris were in the Suburban during the Iowa pursuit. None of the Iowa officers testified to seeing Talley despite chasing the Suburban for ten to fifteen minutes through Davenport. And after the chase, the six-year-old sister told police her uncle, not her father, had been driving.

Likewise, the jail call between Talley and Harris undermines any presumption that both brothers were in the car during the chase in Iowa. Talley told Harris it was hard to secure bail because the authorities were "mad as hell" that Harris was "driving around Davenport for thirty minutes running from police." Talley also recounted how he told others that it was not him who was driving recklessly in Davenport but his little brother. During the same call, Harris admitted

---

[3] Although Harris was not the parent, if he was driving the Suburban, he had "control" over the instrumentality contributing to the risk to the children. *See State v. Anspach*, 627 N.W.2d 227, 235 (Iowa 2001).

driving the Suburban in Davenport. In line with that admission, Harris pleaded guilty to eluding and child endangerment.

Without evidence that Talley encouraged or lent countenance to Harris's erratic driving *while it was happening*, the State is left with the option of showing Talley did so *before* his brother's eluding started. Yet the State offered no evidence Talley encouraged Harris—in advance—to go lead police on a high-speed chase through Davenport during rush hour with Talley's three children in the backseat.

Granted, as the State argues, direct evidence is unnecessary to prove aiding and abetting. The State may establish by circumstantial evidence that the accused knew about the crime before or at the time of its commission. *See Tangie*, 616 N.W.2d at 574. Circumstantial evidence may include "presence, companionship, and conduct before and after the offense is committed." *State v. Lewis*, 514 N.W.2d 63, 66 (Iowa 1994) (citation omitted). In identifying relevant circumstantial evidence, the State concedes "Harris's testimony superficially supported the defense narrative" that Talley was not in the Suburban during the Iowa chase. But the State grades Harris's testimony as "demonstrably false, conveniently vague, and self-sacrificing" thus providing circumstantial evidence of Talley's guilt.

Based largely on its critique of Harris's credibility, the State defends the district court's decision to instruct on both theories. On the theory Talley was the principal, the State contends: "If Harris was lying about driving, then Talley was driving the vehicle in circles waiting for his ride and was liable for his attempt at eluding the police and the danger he created for his children." On the theory Talley was an aider and abettor, the State reasons: "If—as their recorded conversation

suggested—Harris drove the vehicle during some part of the Davenport pursuit as Talley attempted to contact people to pick him up mid-chase, then Harris likely took control of the Suburban and care of Talley's children at his brother's direction."

First, we question whether a "likelihood" is enough to prove beyond a reasonable doubt that Talley aided and abetted Harris's acts of eluding and child endangerment. *See Henderson*, 908 N.W.2d at 876 (explaining "foreseeability, as opposed to knowledge or intent is not enough to sustain aiding-and-abetting conviction"); *Smith*, 739 N.W.2d at 294 (finding insufficient evidence to submit to the jury the State's claim that Smith was guilty—under theory of joint criminal conduct—of crimes committed by his confederate who shot a deputy).

Second, speculation that Harris took control of the vehicle and the children at Talley's direction is not the same as proving Talley aided and abetted those criminal offenses. *See Henderson*, 908 N.W.2d at 877 (citing with approval federal authority holding conviction for aiding and abetting requires "not just an act facilitating one or another element, but also a state of mind extending to the entire crime"); *see also State v. McGrean*, No. 12-0537, 2013 WL 1453147, at *4 (Iowa Ct. App. Apr. 10, 2013) (finding evidence created only "suspicion, speculation, or conjecture" about McGrean's participation as an aider and abettor). Where is the State's proof that, by handing over control of the Suburban, Talley encouraged Harris to exceed the speed limit by more than twenty-five miles per hour and to "willfully fail" to stop when signaled by a uniformed officer? Where is the State's proof that, by leaving the children in their uncle's care, Talley encouraged Harris to knowingly create a substantial risk to their health and safety?

In the end, neither direct nor circumstantial evidence sustains the prosecutor's belated theory of aiding and abetting. The defense case pointing to Harris as the driver did not automatically open the door to a theory of vicarious liability. As the prosecutor said in resisting the motion for judgment of acquittal, a reasonable jury could believe Harris was lying and Talley "was in fact the person driving" during the high-speed chase in Davenport. But conversely, the State did not generate a jury question on the alternative theory that Harris was telling the truth and Talley encouraged Harris to elude the police or endanger Talley's children. The record lacked sufficient evidence to support a jury instruction on aiding and abetting.

Because the jury returned general verdicts—not specifying between the State's two theories—we must reverse and remand for a new trial.[4] *See Smith*, 739 N.W.2d at 295 (citing *State v. Hogrefe*, 557 N.W.2d 881 (Iowa 1996)). Having reversed on the insufficient proof of aiding and abetting, we find it unnecessary to resolve Talley's ineffective assistance claim. But should Talley go to trial again, we emphasize the marshalling instructions should require the jury to find he committed the crimes "wholly or partly within the State of Iowa." *See State v. Liggins*, 524 N.W.2d 181, 185 (Iowa 1994) (discussing territorial jurisdiction).

**REVERSED AND REMANDED FOR NEW TRIAL.**

---

[4] *But see* Iowa Code § 814.28 (2019) (barring appellate revision of a verdict "on the basis of a defective or insufficient theory if one or more of the theories presented and described in the complaint . . . is sufficient to sustain the verdict on at least one count").