# IN THE COURT OF APPEALS OF IOWA

No. 19-1062
Filed April 14, 2021

**STATE OF IOWA,**
Plaintiff-Appellee,

**vs.**

**CHAD LITTLE,**
Defendant-Appellant.
_____

Appeal from the Iowa District Court for Black Hawk County, Joel A. Dalrymple, Judge.

A defendant appeals his convictions for first-degree murder and child endangerment resulting in death. **AFFIRMED.**

Christopher J. Roth of Roth Weinstein, LLC, Omaha, Nebraska, for appellant.

Thomas J. Miller, Attorney General, and Sharon K. Hall, Assistant Attorney General, for appellee.

Heard by Vaitheswaran, P.J., and Tabor and Ahlers, JJ.

**TABOR, Judge.**

Four-year-old G.B. died from blunt-force head trauma. A jury convicted her mother's paramour, Chad Little, of first-degree murder and child endangerment resulting in death. Little appeals those convictions, asserting (1) the district court admitted improper character evidence; (2) the State offered insufficient proof that he committed the crimes; (3) the verdicts were against the weight of the evidence; and (4) his trial counsel was ineffective. Finding no reversible error, we affirm his convictions.

## I. Facts and Prior Proceedings

During the fall of 2014, Kristi Buss[1] was living with her daughter, G.B., and her eleven-year-old son, I.M., in a two-story duplex on Downing Court in Waterloo. Buss began dating Little in September and he soon moved into the duplex.[2] Although Little was not their biological father, he referred to G.B. and I.M. as his "daughter and son."

But Little's infiltration of the family was toxic. According to several witnesses, Little was abusive, especially toward G.B. Her brother, I.M. (age fifteen by the time of trial), disclosed that Little pushed and hit G.B. about once a week after Little moved in with them. I.M. said G.B. often had bruises on her face that their mother would disguise with makeup. I.M. recalled Little saying that the

---

[1] Buss is not a party to this appeal. The State also charged her with child endangerment resulting in death under Iowa Code section 726.6(4) (2015). Little moved to sever the trials. Receiving no resistance from the State, the district court granted the severance.

[2] Before moving in with Buss, Little lived at his parent's house in Waterloo. His sister and mother testified for the defense that Little continued to live with them in the fall of 2014.

bruising resulted from G.B. falling down stairs or that "ghosts beat her when she was sleeping."

Buss's next-door neighbor, Jennifer Ackerman, said she repeatedly heard "[f]ighting, yelling, screaming, pounding, [and] banging" after Little moved in. She recalled his outbursts escalated between October and December 2014, then became "every day off the rails."

Little's long-time friend, Frank Perrin, visited Downing Court two to three times a week in 2015. According to Perrin, the children were always home and either Buss or Little would be watching them. Perrin said he kept his visits to an hour because Little would "become a little off the wall." When asked what that meant, Perrin explained, "Like yelling and like paranoia." Perrin linked Little's "irrational behavior" to their consumption of methamphetamine. Perrin also recalled an incident, a couple of months before G.B.'s death, when Little had "snatched" G.B. up by her arm and slapped her in "the torso area."

Nashae Cook, whose mother also lived on Downing Court, witnessed a similar assault about a month before G.B.'s death. According to Cook, G.B. was outside with Little when she fell off her training bicycle. Little "picked her up, like, by the hair" and said, "Get up, bitch." As Cook recalled: "It was like he was in a rage." Little later admitted to this incident in a police interview.

On the evening of May 29, Little had several people over to Buss's house. Around 10:00 p.m., Perrin, Little, and another friend, were upstairs smoking methamphetamine. After about an hour, Perrin and the friend left. Around midnight, another acquaintance, Todd Hanson, helped Little and Buss move a couch into the home. Hanson recalled seeing both children in their bedrooms.

When the prosecutor asked how G.B. appeared, Hanson replied, "Fine. She was just sitting there." After Hanson left, he received several text messages from Little, including a message at 3:56 a.m. that said, "Call asap, out riding bikes, gonna kill somebody."

A few hours later, around 8:45 a.m., triage nurse Susan Doyle received a disturbing call on the Ask-a-Nurse hotline. A male caller sounded "very nervous" and "upset." The caller told the nurse that his daughter might have fallen down the stairs during the night and had a seizure. He said she was unresponsive and had bruises on her face and knees. He also described her stomach as "bloated and hard." When the nurse asked for the address, the caller said he did not know. Realizing the caller had not summoned an ambulance, the nurse called 911.[3] Police later discovered Little had called using Buss's cell phone and a fake name. Neither Buss nor Little called 911.

Before emergency personnel arrived, Little left the house with I.M. They went to neighbor Karen Riggs's trailer. Little asked to use her phone to call an ambulance for his daughter. Riggs did not believe him so she denied his request. Little then took I.M. to the Miracle Car Wash, where Little again asked to use the phone. Witnesses at the car wash overheard Little saying his daughter fell down the stairs and was on her way to the hospital. He also stated, "She might be dying."

The ambulance arrived on Downing Court shortly after 9:00 a.m. Paramedic Kyle Fuller spoke with Buss, who was waiting outside. Buss told him

---

[3] Nurse Doyle testified the caller identified himself as "Adam Merrick," so she relayed that name to the 911 operator. But Adam Merrick, who knew Little from elementary school, told police that he did not make the call or live in Waterloo when these events took place.

"that [G.B.] had possibly gotten up a couple hours prior to [the] 911 call to get a glass of water and fell down some stairs." She explained G.B. had a history of seizures and "it was typical for her to be unresponsive or sleepy after a seizure." But when Fuller saw G.B.'s condition, he "questioned the story." The child was unconscious, pale, and breathing irregularly. She had external injuries all over her body and showed signs of severe brain trauma.

Paramedics transported G.B. to a Waterloo hospital, where Dr. James Poock examined her. Dr. Poock observed bruises on both sides of her temples. He noted "the bruise on her left temple looked to be relatively recent" and "more distinct and identifiable" while "[t]he bruise on her right temple appeared to be older." Many other bruises on her body were "in different stages of healing." Dr. Poock explained that G.B.'s reaction to pain stimuli was a sign of traumatic brain injury. He diagnosed her with a skull fracture and "bleeding within the brain." Based on the severity of her head injuries, Dr. Poock transferred her to pediatric intensive care at the University of Iowa Hospitals and Clinics. Despite that level of care, G.B. died from her injuries three days later.

Medical examiner Dr. Dennis Firchau performed G.B.'s autopsy. He concluded her cause of death was "blunt force injuries of the head." He testified the manner of death was "undetermined." In other words, Dr. Firchau could not say for certain whether the injuries were inflicted or accidental. The autopsy report chronicled a long list of injuries, including contusions of the face and chin; contusions of the chest, back, and flanks; contusions of the upper and lower extremities; contusions of the deep scalp tissues; soft tissue damage of the chest and neck; teeth fractures; and retinal hemorrhages. Dr. Firchau also found

evidence of hippocampal sclerosis, a scarring of the brain often associated with seizure disorders. Based on that finding, he testified "it would not surprise [him] if [G.B.], indeed, had a seizure disorder."

Besides Dr. Firchau, the State called two other medical experts: Dr. Resmiye Oral, director of the University Hospitals' child protection program, and Dr. Richard Olson, a pediatric ophthalmologist. Dr. Oral—who examined G.B. in intensive care—recounted that the child had sustained severe external injuries, as well as deep soft tissue injuries, uncommon in accidental falls. For example, she said it would be "very rare to see a depressed skull fracture" from a household accident. Based on the constellation of injuries, Dr. Oral opined that G.B. died from abusive head trauma. She testified: "I have never seen a four-year-old competent child injuring herself accidentally with this severity, this number, and the size of the injuries that are seen on all planes of her body." Dr. Oral explained abusive head trauma could lead to a seizure disorder.

Dr. Olson conducted a postmortem examination of G.B.'s eyes. He observed "dozens, maybe 30 to 100" layers of small hemorrhages (or bleeding) in both of her retinas. He also found macular folds, which he explained were "very rare." Both findings suggested severe abusive trauma. Dr. Olson testified he had never seen different layers of hemorrhages and macular folds result from accidental trauma.

For a different opinion, the defense offered testimony from forensic pathologist Amy Gruszecki.[4] After reviewing the autopsy report, Dr. Gruszecki

[4] Dr. Gruszecki is the chief pathologist of American Forensics, an independent medical practice in Texas.

could not rule out an accidental fall. In Dr. Gruszecki's view, the bruises and scrapes were mostly "small little contusions" not so uncommon for a four-year-old girl. Dr. Gruszecki also did not find the retinal hemorrhages as concerning as Dr. Olson did. She explained, "[I]t's very difficult to look at retinal hemorrhages in and of themselves and say it's definitely trauma, meaning inflicted trauma . . . ."

Meanwhile, police launched an investigation. When Officer Jon Gergen interviewed Little on May 30, Little denied being at Buss's house the night before.[5] In fact, Little said he hadn't been there for a week. When Officer Gergen asked if Little knew what happened to G.B., Little said he heard from Buss that she had a seizure. Little added that G.B. was falling down the stairs a lot. As the interview went on, Little changed his story. He acknowledged being at the house from 7:00 p.m. to 10:00 p.m. on May 29 but insisted he did not spend the night. Little then admitted returning to the house in the morning but said he left before 8:30 a.m.

Officer Jody Stratton of the Waterloo Police crime lab executed a search warrant at Buss's residence. She collected blood-stained items, including a mattress, a pillow case, a blue striped comforter, a silver spoon, and a white washcloth. Those items tested positive for blood matching G.B.'s DNA profile. Officers also seized a glass pipe used for smoking methamphetamine. In Buss's bedroom, investigators found a letter signed by Little that read, "I'm very sorry for

---

[5] Officer Gergen videotaped the interview. When he watched the video to write his report, he noticed that when he was out of the room Little took a ring off his right hand and moved it to his left hand, and removed a second ring and placed it in his pocket. In closing argument, the prosecutor acknowledged that ring evidence was not "the end-all/be-all" of the case, but pointed to the "deep purple bruise on the left side of [G.B.'s] head," saying Little's evasive gesture was "just another consideration."

snapping on [G.B.]. I lost my temper know [sic] joke." As for the layout of the house, Officer Stratton described two short flights of carpeted stairs from the main level to the top floor. She did not find any blood near the stairs.

The State charged Little with murder in the first degree, a class "A" felony, in violation of Iowa Code section 707.2(1)(e), and child endangerment resulting in death, a class "B" felony, in violation of Iowa Code section 726.6(4).

Both parties moved in limine to exclude certain evidence. The State sought to prevent the defense from offering hearsay statements by Buss. The defense targeted evidence of Little's criminal history, methamphetamine use, and prior acts of abuse against Buss, G.B., or I.M. At an April 2019 hearing, the district court granted the State's motion. The court granted Little's request to exclude his criminal record but ruled evidence of prior acts of abuse and drug use were admissible for their probative value.

After the State presented its case-in-chief, Little moved for judgment of acquittal on both child endangerment and first-degree murder. The court denied his motion. After five days of evidence, the jury returned guilty verdicts on both counts. Little moved for a new trial, challenging the bad-acts evidence and claiming the jury's verdicts were against the weight of the evidence. The court denied the motion and sentenced him to life imprisonment without the possibility of parole.[6] Little now appeals.

---

[6] The court merged the conviction for child endangerment resulting in death into the conviction for first-degree murder.

**II. Analysis**

**A. Admissibility of Character Evidence**

We review the district court's ruling on the admission of prior-bad-acts evidence for an abuse of discretion. *State v. Putman*, 848 N.W.2d 1, 7 (Iowa 2014). Under this standard, we consider whether the court reached its decision on untenable grounds. *State v. Plain*, 898 N.W.2d 801, 811 (Iowa 2017). We find an abuse of discretion if the court's reasoning was "based on an erroneous application of the law or not supported by substantial evidence." *Id.* (quoting *State v. Dudley*, 856 N.W.2d 668, 675 (Iowa 2014)).

Generally, evidence of prior bad acts is not admissible to prove character. Iowa R. Evid. 5.404(b). But it may be admissible to show "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* Dubbed "an exclusionary rule," rule 5.404(b) operates to keep out evidence aimed to cast the defendant as a bad person from which "the jury is likely to infer he or she committed the crime in question." *State v. Sullivan*, 679 N.W.2d 19, 24 (Iowa 2004).

To be admissible, evidence of prior bad acts must meet three requirements. *Putman*, 848 N.W.2d at 9. First, the evidence must be "relevant to a legitimate, disputed factual issue." *Id.* The State must identify a disputed issue "other than the defendant's general propensity to commit wrongful acts." *State v. Wilson*, 878 N.W.2d 203, 211 (Iowa 2016). Evidence is relevant when it has a "tendency to make a fact more or less probable than it would be without the evidence" and "[t]he fact is of consequence in determining the action." Iowa R. Evid. 5.401. Second, there "must be clear proof the individual against whom the evidence is offered

committed the bad act or crime." *Putman*, 848 N.W.2d at 9 (quoting *Sullivan*, 679 N.W.2d at 25). Credible witness testimony may satisfy this requirement. *Id.* And third, the evidence's prejudicial effect must not substantially outweigh its probative value. *Id.* at 10. In weighing probative value against unfair prejudice, we assess

> the need for the evidence in light of the issues and the other evidence available to the prosecution, whether there is clear proof the defendant committed the prior bad acts, the strength or weakness of the evidence on the relevant issue, and the degree to which the fact finder will be prompted to decide the case on an improper basis.

*Id.* at 9–10 (quoting *State v. Taylor*, 689 N.W.2d 116, 124 (Iowa 2004)).

### 1. Methamphetamine Use and Effects

Little challenges the admission of testimony regarding his prior methamphetamine use. Little claims the court should have excluded his friend Perrin's testimony that they used methamphetamine together, and that when using methamphetamine, Little would exhibit "off-the-wall," "irrational," and "paranoid" behavior. Little contends those statements "created a strong inference" that he used methamphetamine on earlier occasions and was thus irrelevant and unfairly prejudicial. In his view, the evidence of drug use "served no other purpose than to inflame the passions of the jury."[7]

In response, the State contends evidence of Little's methamphetamine use on May 29 was relevant for the non-character purposes of intent and lack of

---

[7] In oral argument, Little asserted the State could not show his drug use was probative without offering expert testimony on the effects of methamphetamine. We disagree. A lay witness may express an opinion about another person's sobriety, if the witness has had a chance to observe the other person. *See State v. Murphy*, 451 N.W.2d 154, 155 (Iowa 1990). The jury could assign the appropriate weight to Perrin's testimony about how methamphetamine affected Little without hearing expert testimony.

accident. The State insists the effects of methamphetamine on Little's behavior was highly probative of his state of mind when G.B. was injured. Likewise, the State claims the evidence helped establish that G.B.'s injuries were not accidental.

We start with relevancy. Was Little's drug use and the effects on his behavior relevant to a legitimate and disputed factual issue? The State first advances intent as a relevant, non-character purpose for admitting Perrin's testimony. Because Little denied being the perpetrator, his intent was at issue in the case. *See State v. Richards*, 809 N.W.2d 80, 95 (Iowa 2012) ("Richards' denials that he was the perpetrator put at issue all the elements of the offense.").

The child-endangerment statute allows the State to prove intent through either of two alternatives: (1) the defendant acted with *knowledge* that his act created a substantial risk to the child's physical health or safety; or (2) the defendant *intentionally* used unreasonable force to commit the act (or series of acts) that caused the child's injuries. *See* Iowa Code § 726.6(1)(a), (b) (emphasis added). To prove knowledge in the context of parental drug use, the State must establish a "nexus between the drug use and the creation of a substantial risk of harm to the child." *State v. Folkers*, 941 N.W.2d 337, 339 (Iowa 2020). "The risk does not have to be likely, probable, or statistically significant," rather it must "be real or identifiable as opposed to speculative or conjectural." *Id.* Knowledge may be inferred from the totality of the circumstances. *See id.* at 340.

The State established that nexus through Perrin's testimony and corroborating evidence. Perrin testified that he and Little used methamphetamine around 10:00 p.m., less than twelve hours before the 911 call. The methamphetamine pipe found during the execution of the search warrant

supported Perrin's story. The testimony that Little became "off the wall" when under the influence of methamphetamine was Perrin's explanation for why he left after an hour. Moreover, Little sent alarming text messages a few hours after the alleged use. Messages sent between 2:00 and 4:00 a.m. alluded to Little being with "his daughter and son," and that he might "kill somebody." The timing and erratic nature of his messages supported the "irrational" behavior described by Perrin. We agree with the State that evidence of Little's methamphetamine use was probative on the knowing-creation-of-risk element of child endangerment. *See State v. Petithory*, 702 N.W.2d 854, 858 (Iowa 2005) ("The dangers of leaving one's children in the custody of actively using methamphetamine addicts cannot be denied."). Proving Little's intent was a proper non-character purpose for admitting this evidence.

Beyond intent, the evidence was relevant to the State's theory of absence of mistake or accident. Little's claim that G.B.'s injuries resulted from an accidental fall or seizure was less believable when the jury had information that Little acted irrationally when under the influence of methamphetamine and was in that state when caring for G.B. the night of May 29.

Having decided Little's drug use was relevant to the issues of intent and absence of mistake or accident, we turn to the clear-proof requirement. Did the State offer clear proof of Little's drug use and resulting "off-the-wall" behavior on May 29? Little says "no," complaining that the sole witness was "also an admitted drug user with mental health issues." We reject this contention. Clear proof for admission requires neither proof beyond a reasonable doubt nor corroboration. *State v. Brown*, 569 N.W.2d 113, 117 (Iowa 1997). Proof is clear if it prevents "the

jury from engaging in speculation or drawing inferences based on mere suspicion." *Id.* (quoting *State v. Spargo*, 364 N.W.2d 203, 209 (Iowa 1985)). Perrin's testimony met the clear-proof standard. Perrin and Little were long-time friends. Yet Perrin declined to spend more than an hour with Little after they used methamphetamine because of his troubling behavior. Perrin testified May 29 was no different. The credibility of Perrin's testimony was for the jury to weigh. *See State v. Shanahan*, 712 N.W.2d 121, 135 (Iowa 2006).

As our third and final step, we consider whether the probative value of the drug-use evidence was substantially outweighed by the risk of unfair prejudice.

We first examine the need for the evidence given the issues and other evidence available to the prosecution. *Putman*, 848 N.W.2d at 9. The State insists Perrin's testimony was essential to proving Little's intent, an element of both child endangerment and first-degree murder.

We agree the need for the evidence was high. G.B. suffered blunt-force head injuries sometime after midnight and before the 911 call. Testimony of how methamphetamine affected Little was important evidence for the jury to consider when inferring his state of mind during those hours. Without the drug-use evidence, the jury lacked context for Little's unusual conduct—sending erratic text messages and riding bikes in the middle of the night. *See Taylor*, 689 N.W.2d at 129 (finding a high need for evidence if it "would clarify the circumstances of the defendant's conduct and thereby shed light on his intent"). Likewise, the State needed the evidence to disprove the competing theory that G.B.'s injuries were accidental. Because the intentional-versus-accidental issue was hotly contested

at trial, evidence showing Little's volatility while using methamphetamine heightened its probative value. *See id.*

But even highly probative evidence is inadmissible if the risk of unfair prejudice is too great. *Putman*, 848 N.W.2d at 14. We recognize evidence of methamphetamine use reflected poorly on Little's character.[8] "But that type of prejudice is inherent in prior-bad-acts evidence and will not substantially outweigh the value of highly probative evidence." *Taylor*, 689 N.W.2d at 130. In fact, the district court noted this distinction in its ruling:

> Particularly focusing on Rule 5.403, the Court does concur with the defense that ordinarily drug use, and particularly methamphetamine use, is prejudicial. However, the Court fails to conclude that the relevant nature of the evidence is substantially outweighed by the danger of unfair prejudice from the admission of said evidence.

In conducting the balancing test, the court relied on the State's promise not to introduce any evidence of "long-standing drug abuse of the defendant."

That reliance was reasonable. Because the State focused on Little's methamphetamine use on the night of G.B.'s injuries and how that use affected his mental state and behavior, the jury was less likely to decide the case on an improper basis. *See Putman*, 848 N.W.2d at 15. On this record, the probative value of the evidence substantially outweighed the risk of unfair prejudice. The court did not abuse its discretion in admitting the drug-use evidence.

---

[8] Little compares his case to *State v. Liggins*, 524 N.W.2d 181, 188 (Iowa 1994), in which the court found that evidence showing Liggins was a cocaine dealer was independent of the murder for which he was on trial and inherently prejudicial. But *Liggins* is distinguishable. The State did not offer evidence Little was a drug dealer. Instead, it tied his personal use of methamphetamine to his mental state and actions at the time of the crime for which he was on trial.

## 2. Prior Acts of Abuse

Little also argues the district court should have excluded testimony concerning his prior abuse of G.B. Three witnesses are at issue. First, Perrin testified that he saw Little grab G.B. by the wrist and slap her torso. Second, neighbor Cook recalled when Little had pulled G.B. by her hair and called the child a "bitch." And third, I.M. testified that Little pushed and hit G.B. about once a week, leaving bruises.

The State asserts those prior incidents of abuse were relevant to proving motive, intent, and absence of mistake or accident.[9] Returning to the three-step inquiry, we must first determine whether the evidence of prior abuse was relevant to a legitimate, disputed factual issue unrelated to Little's criminal disposition.

For the murder charge, a key issue was malice aforethought. *See State v. Newell*, 710 N.W.2d 6, 21 (Iowa 2006). Malice aforethought means a fixed purpose to do physical harm to another before the person acts. *Id.* Evidence revealing an "acrimonious relationship" between the defendant and the victim is pertinent to whether the defendant acted with malice. *Id.* As in *Newell*, Little's history of violence and vitriol toward G.B. was relevant to determine his intent and motive for harming the child. *See id.*; *see also State v. Tucker*, 435 A.2d 986, 991 (Conn. 1980) (finding prior acts of child abuse were relevant because "a pattern of

---

[9] Little asserts the State did not argue non-character theories of motive or intent when discussing the prior-abuse evidence at the motion-in-limine hearing. But the district court interpreted the State's position as urging admission not only to prove absence of mistake or accident, but also for motive and intent. We find no roadblock to the State arguing alternative theories for affirming on appeal. *Cf. Lamasters v. State*, 821 N.W.2d 856, 864 (Iowa 2012) ("Where the trial court's ruling, as here, expressly acknowledges that an issue is before the court and then the ruling necessarily decides that issue, that is sufficient to preserve error.").

behavior and an attitude toward the child is indicative of the defendant's state of mind"), *superseded by statute on other grounds by State v. Pare*, 755 A.2d 180 (Conn. 2000); *State v. Tate*, No. 04-1479, 2006 WL 334185, at *5 (Iowa Ct. App. Feb. 15, 2006) (concluding prior verbal abuse of child "was strong evidence on the issue of defendant's intent"). Similarly, Little's past abusive conduct was relevant to rebutting his claim of accident. *See Tucker*, 435 A.2d at 991. Because Little's intent to harm G.B. and the manner of her death were at issue, the State articulated proper non-character theories for admitting the evidence.

The State also offered "clear proof" of the prior abusive acts. All three witnesses observed Little's assaults against G.B. and gave detailed accounts of their recollections. *See State v. Rodriquez*, 636 N.W.2d 234, 243 (Iowa 2001).

Finally, the risk of unfair prejudice did not substantially outweigh the probative value of the prior-abuse evidence. Only Little and Buss knew what happened to G.B. that night. The defense disputed Little's intent to harm the child. Defense counsel stressed that Little took the "proactive step" of calling Ask-A-Nurse to seek help. Thus, the State needed the prior-abuse evidence to "shed light on his intent." *See Taylor*, 689 N.W.2d at 129. No question, the prior assaults painted a negative impression of Little. But their probative value was significant because they revealed the true nature of Little's relationship with the child. *See Newell*, 710 N.W.2d at 23 (concluding evidence of relationship between accused and victim admissible to show accused's state of mind). The district court properly exercised its discretion in admitting the prior-acts evidence.

## B. Sufficiency of the Evidence

We review sufficiency challenges for correction of errors at law. *State v. Tipton*, 897 N.W.2d 653, 692 (Iowa 2017). We uphold the verdicts if substantial evidence supports them. *Id.* Substantial evidence is the quality and quantity of proof that would convince a reasonable jury that the defendant is guilty beyond a reasonable doubt. *Id.* We consider the evidence in the light most favorable to the State, including all legitimate inferences we can gather from the record. *State v. Williams*, 695 N.W.2d 23, 27 (Iowa 2005). The State must prove every fact necessary to constitute the charged crimes. *State v. Kemp*, 688 N.W.2d 785, 789 (Iowa 2004). A conviction may rest on circumstantial evidence if it is compelling enough to convince the jury of the defendant's guilt. *Tipton*, 897 N.W.2d at 692. The jury weighs the credibility of the evidence. *See State v. Trane*, 934 N.W.2d 447, 455 (Iowa 2019).

### 1. Child Endangerment Resulting in Death

Little first argues the record contains insufficient evidence to support his conviction for child endangerment resulting in death. He contests the jury's finding that he caused G.B.'s death.[10]

To support this conviction, the State had to prove these four elements:

> 1. During the period of August of 2014 through May of 2015, [Little] was a person having custody of [G.B.]; or [Little] was a person having control of [G.B.]; or [Little] was a member of the household in which [G.B.] resided.
> 2. [G.B.] was under the age of fourteen years.

---

[10] Little strenuously challenged the element of control, custody, and household member in his motion for judgment of acquittal. But he abandons that argument on appeal.

      3. [Little]:
        a. Acted with knowledge that his acts were creating a substantial risk to [G.B.'s] physical health or safety.
          or
        b. Intentionally committed an act or a series of acts which used unreasonable force, torture, or cruelty that resulted in bodily injury to [G.B.].
        4. [Little's] acts resulted in the death of G.B.

Little asserts he is contesting the third element. But his claim goes beyond knowledge or intent. He insists the State did not prove beyond a reasonable doubt that he was the perpetrator. Put differently, he maintains the State had to prove he committed an act that caused G.B.'s death or G.B. was in his "sole care" when the injuries occurred.[11] He contends the State did neither.

To counter, the State insists substantial evidence supported the jury's finding that Little caused G.B.'s death. From the record, the State highlights "Little's flight from the scene, inconsistent statements about the girl's purported seizure and alleged fall, inconsistent claims of his whereabouts, and attempts to blame others for the child's injuries well before he learned of G.B.'s death and likely cause of death." The State also relies on "Little's demeanor toward and treatment of G.B., his behavior when using drugs, and the large rings he wore and attempted to hide during his first police interview."

---

[11] To bolster his position, Little relies on four cases: *State v. Watkins*, 659 N.W.2d 526, 537 (Iowa 2003); *State v. Porter*, No. 12-0170, 2013 WL 2146543, at *1 (Iowa Ct. App. May 15, 2013); *State v. Neiderbach*, 837 N.W.2d 180, 218–19 (Iowa 2013); and *State v. Schlitter*, 881 N.W.2d 380, 390 (Iowa 2016). Those cases embrace the general proposition that to prove child endangerment, the State must show the defendant either committed an act resulting in the injury or was the only person caring for the child when the injuries occurred. We need not reach the "sole care" issue because we find sufficient evidence to support the jury's finding that Little committed the acts resulting in G.B.'s death.

Little acknowledges the State offered medical testimony "that G.B. was injured through a non-accidental act." Because the jury accepted that G.B.'s death was not accidental, the question boils down to whether Little or Buss—the two adults supervising G.B. before her death—was the perpetrator.

Viewing the record in the light most favorable to the State, substantial evidence shows that Little was the person responsible for G.B.'s death. While several witnesses confirmed that Little had assaulted G.B. in the recent past, no evidence showed Buss was abusive toward G.B. In fact, I.M. testified that Buss rarely raised her voice and never used force to discipline either of them.

Faced with the choice of two possible perpetrators—only one of whom has lashed out at the child in front of witnesses and admitted losing his temper—the jury could reasonably believe that Little was more likely to have caused G.B.'s injuries. *See Schlitter*, 881 N.W.2d at 391 (holding evidence could not show that Schlitter caused the child's death because several caretakers were present when the injuries occurred and "[t]here was *no testimony that Schlitter had ever inflicted unreasonable force on K.S. in the past* or that he had ever shaken her" (emphasis added)). Under these circumstances, Little's prior assaults against G.B. supported the jury's conclusion that he was the perpetrator.

We also agree with the State that Little's conduct and inconsistent statements to police after G.B. sustained her injuries revealed a "consciousness of guilt." *See State v. Syperda*, No. 18-1471, 2019 WL 6893791, at *7 (Iowa Ct. App. Dec. 18, 2019) (noting the defendant's lies and inconsistent statements to police during the murder investigation bolstered the conclusion that he was the person responsible). For example, Little gave shifting answers when asked if, and

when, he was at Buss's house the night before and into the morning. He also denied calling the Ask-a-Nurse hotline and using the name "Adam Merrick" despite phone records and witness accounts refuting his story. Likewise, his flight from the house while knowing G.B. was in critical condition revealed an intent to separate himself from the scene of her injuries. The jury could properly infer Little's guilt based on his actions and inconsistencies. *See State v. Hythecker*, No. 01-1048, 2002 WL 987966, at *3 (Iowa Ct. App. May 15, 2002) (collecting cases).

Moreover, the State's medical evidence contributed to the substantial proof to rebut Little's claim of accident. Dr. Poock, who first examined G.B. in the emergency room, noted many bruises in different stages of healing all over the child's face and body. Focusing on the facial injuries, Dr. Poock explained:

> The two bruises on her temple, the bruise on her left temple looked to be relatively recent. It was kind of a dark red-purplish color consistent with a relatively recent bruise. The bruise on her right temple appeared to be older, more of a blueish-green color that occurs as a bruise ages.

He offered similar findings about the bruises on the child's back, arms, hip, and iliac crest area. Based on the different coloring of the bruises, Dr. Poock opined "all those injuries didn't occur in one incidence." He added: "In my 35-plus years of being a paramedic and a physician I've seen multiple children fall, fall down stairs, and I've seen multiple children who have been abused, and these injuries are more consistent with those that have been abused than those that have fallen down the stairs." Consistent with Dr. Poock's testimony, both Dr. Oral and Dr. Olson observed head and eye injuries that defied Little's claim of accident.

Considering the entire record, reasonable jurors could find that someone inflicted G.B.'s injuries and that someone was Little. *See Porter*, 2013 WL 2146543, at *4 ("A jury also could consider the similar, but less severe injuries the child sustained in April while in Porter's care, and Porter's explanation of the cause, which was contradicted by the medical evidence, as supporting its finding she was the person who caused the later, fatal injuries."). Substantial evidence supports the child-endangerment conviction.

### 2. First-Degree Murder

Little next challenges the sufficiency of the evidence for his first-degree murder conviction. He contends the State offered insufficient proof that he acted with malice aforethought or with an extreme indifference to human life.[12]

For the jury to convict Little of first-degree murder, the State needed to prove:

> 1. On or about the 29th or 30th day of May, 2015, [G.B.] was injured.
> 2. [G.B.] was then under the age of 14.
> 3. [G.B.] died as a result of being injured.
> 4. [Little] acted with malice aforethought.
> 5. [G.B.]'s injury was a result of [Little] committing the offense of:
>> a. Child Endangerment as defined in Instruction No. 26.
>> or
>> b. Assault as defined in Instruction No. 28.
> 6. [G.B.'s] death occurred under circumstances showing an extreme indifference to human life.

---

[12] Little also claims the evidence did not show he was guilty of the child-endangerment alternative. Having found sufficient proof to support the child-endangerment conviction, we need not address that argument a second time.

Little contends "there was scant evidence" of his state of mind. He claims the State's only proof he acted with malice was the cryptic text message in which he wrote: "Call asap, out riding bikes, gonna kill somebody."

Relevant to this issue, the jury received an instruction that said: "Malice may be inferred from the commission of child endangerment which results in serious injury or death." The State leans on this inference. According to the State, "the extent and severity of G.B.'s head injuries overwhelmingly support a finding of abusive/inflicted trauma satisfying the elements of malice and extreme indifference." We agree.

Malice aforethought is often proved by circumstantial evidence. *State v. Buenaventura*, 660 N.W.2d 38, 49 (Iowa 2003). Like the intent element of child endangerment, "the prior relationship between the defendant and the victim, including bad feelings, quarrels, and physical acts, is a circumstance that may be shown to prove the defendant's state of mind and motivation at the time of the crime." *Newell*, 710 N.W.2d at 21 (citing *Taylor*, 689 N.W.2d at 128).

Based on this overlap, the jury could infer malice based on its finding that Little committed child endangerment resulting in death. *See Porter*, 2013 WL 2146543, at *5. Given his past cruelty toward G.B., the jury could reasonably infer he acted with a fixed purpose to cause her physical harm. *See Newell*, 710 N.W.2d at 21. Moreover, the severity of G.B.'s head injuries, coupled with the medical testimony describing her injuries as abusive trauma, backed the jury's finding that Little acted with an extreme indifference to human life. *See State v. Thompson*, 570 N.W.2d 765, 768 (Iowa 1997) ("We agree that the phrase 'manifesting an extreme indifference to human life,' when considered in the context of a killing of

a child with malice, sufficiently describes the aggravating circumstance elevating the act from second-degree to first-degree murder so as to need no further or other explanation."). Thus, substantial evidence supports the murder conviction.

### C. Motion for New Trial

In the alternative, Little claims the district court should have granted him a new trial because the verdicts were against the weight of the evidence. *See* Iowa R. Crim. P. 2.24(2)(b)(6). Before sentencing, Little asked the court to set aside the verdicts and order a new trial. The court declined. Citing the proper weight-of-the-evidence standard from *State v. Ellis*, 578 N.W.2d 655 (Iowa 1998), the court reasoned this was not an extraordinary case in which the evidence weighed heavily against the verdicts.

The district court has broad discretion in ruling on a motion for new trial. *Id.* at 659. But it should "exercise this discretion carefully and sparingly" when using the weight-of-the-evidence standard. *Id.* Weight of the evidence "requires the district court to determine whether more credible evidence supports one side or the other." *State v. Shorter*, 893 N.W.2d 65, 70 (Iowa 2017). In doing so, the court must not "lessen the jury's role as the primary trier of fact and invoke its power to grant a new trial" unless "the evidence preponderates heavily against the verdict." *State v. Maxwell*, 743 N.W.2d 185, 193 (Iowa 2008).

As an appellate court, we review the district court's ruling for an abuse of discretion. *State v. Reeves*, 670 N.W.2d 199, 203 (Iowa 2003). Our review is limited to "the exercise of discretion by the trial court, not of the underlying question of whether the verdict is against the weight of the evidence." *Id.* (citations omitted). We reverse only if the moving party shows the court's ruling was based "on

grounds or for reasons clearly untenable or to an extent clearly unreasonable." *Id.* at 202.

On appeal, Little fails to specify how the court abused its discretion in denying his motion. He does not attack or bolster the credibility of any witnesses nor identify "any critical piece of evidence" the jury ignored in reaching its verdicts. *See State v. Grant*, 722 N.W.2d 645, 648–49 (Iowa 2006). Instead, Little revisits his sufficiency argument, asserting "there was scant evidence showing that [he] was the actor [who] caused G.B.'s injuries." Because the district court properly exercised its discretion, we affirm the denial of the motion for new trial.

## D. Ineffective Assistance of Counsel

Finally, Little contends he received ineffective assistance of trial counsel based on these errors: (1) failing to impeach I.M. on his inconsistent statements during cross-examination; (2) entering into a stipulation with the State to limit the medical examiner's testimony; and (3) failing to challenge the sufficiency of the evidence on the assault alternative to first-degree murder. Because Little raises these claims on direct appeal, we must decide whether the record is adequate to assess counsel's performance and any prejudicial effect.[13]

We normally preserve claims of ineffective assistance of counsel for postconviction-relief (PCR) proceedings. *Trane*, 934 N.W.2d at 465. At those

---

[13] Iowa Code no longer permits appellate review of ineffective-assistance-of-counsel claims on direct appeal. *See* 2019 Iowa Acts ch. 140, § 31 (codified at Iowa Code § 814.7 (Supp. 2019)). But that provision only applies to judgments entered after July 1, 2019. *State v. Macke*, 933 N.W.2d 226, 228 (Iowa 2019). Because the district court entered judgment in June 2019, we have statutory authority to consider Little's claims of ineffective assistance of counsel. *See State v. Kuhse*, 937 N.W.2d 622, 627 (Iowa 2020).

proceedings, defense counsel has the chance to explain the actions taken. *See State v. Haas*, 930 N.W.2d 699, 703 (Iowa 2019). Preservation also permits the parties to "develop an adequate record of the claims." *Id.*

After reviewing the trial record, we opt to preserve the first two ineffective-assistance claims for a possible PCR action. Counsel may have had strategic reasons for not cross-examining I.M. on his inconsistent statements and for agreeing to limit the medical examiner's testimony under *State v. Tyler*, 867 N.W.2d 136, 163 (Iowa 2015). Thus, we believe counsel should have the chance to explain the defense strategy and develop the record on these issues.

Still, we must address Little's third claim because "no reasonable trial strategy could permit a jury to consider a crime not supported by substantial evidence." *Schlitter*, 881 N.W.2d at 390. To assess counsel's performance, we must determine whether a competent attorney would have moved for judgment of acquittal on the assault alternative to first-degree murder. *See id.* We depart from the ineffective-assistance framework and ask whether that motion would have prevailed under the sufficiency standard. *See State v. Henderson*, 908 N.W.2d 868, 874–75 (Iowa 2018). Thus, "we view the evidence in the light most favorable to the State and will consider whether there is substantial evidence supporting the defendant's conviction." *Id.* at 875.

As an alternative to child endangerment, the State presented the theory that Little caused G.B.'s injuries while committing an assault. *See* Iowa Code § 708.1(2)(a), (b). In briefing, Little does not identify which assault elements are unsupported by the record. Thus, Little waives this issue. *See State v. Campbell*,

No. 00-1053, 2002 WL 597306, at *2 (Iowa Ct. App. Mar. 13, 2002) (citing *State v. Greene*, 592 N.W.2d 24, 29 (Iowa 1999)).

Even if we were to reach the merits, substantial evidence supports the jury's finding that Little committed an assault for the same reasons the jury found him guilty of child endangerment. The record shows that Little was at the house during the timeframe when G.B. was injured. Based on the opinion evidence of the State's medical experts, the jury could find that G.B. died from abusive head trauma. In deciding if Little inflicted the head injuries, the jury could consider I.M.'s testimony that Little routinely assaulted G.B., often leaving bruises on her face. And given Little's aggression toward G.B. in prior months, the jury could conclude that he committed an act intending to cause her pain or injury resulting in her death.

For these reasons, Little cannot show counsel breached a duty by failing to challenge the assault alternative. In any event, Little suffered no prejudice from counsel's omission. We can tell from their answers to the interrogatories that the jurors unanimously found him guilty of first-degree murder on both alternatives. This is a not a general-verdict case in which we have no way to know which alternative the jury relied on. *See, e.g.*, *Schlitter*, 881 N.W.2d at 391 (citing *State v. Tyler*, 873 N.W.2d 741, 753–54 (Iowa 2016)); *see also State v. Warren*, 955 N.W.2d 848, 857 (Iowa 2021). Thus, his ineffective-assistance claim must fail.

**AFFIRMED.**