# IN THE SUPREME COURT OF IOWA

No. 20–0280

Submitted March 31, 2022—Filed May 20, 2022

**STATE OF IOWA,**

      Appellee,

vs.

**JORDAN McKIM CRAWFORD,**

      Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Jefferson County, Lucy J. Gamon, Judge.

The defendant challenges the sufficiency of the evidence to support his convictions for aiding and abetting robbery and ongoing criminal conduct. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT OF CONVICTION REVERSED, SENTENCE VACATED, AND REMANDED FOR RESENTENCING.**

Oxley, J., delivered the opinion of the court, in which all justices joined.

Martha J. Lucey, State Appellate Defender, Maria Ruhtenberg, Assistant Appellate Defender, and Allison Adams (argued), law student, for appellant.

Thomas J. Miller, Attorney General, and Zachary Miller (argued), Assistant Attorney General, for appellee.

**OXLEY, Justice.**

Jordan Crawford participated in a three-week crime spree that involved using a torch to cut into an ATM, robbing a bank, driving to Oregon with the proceeds to buy marijuana, and then returning to Iowa to sell the drugs. For his involvement, Crawford was convicted of first-degree robbery and ongoing criminal conduct, and sentenced to twenty-five years on each. After the court of appeals affirmed his convictions, we granted further review to determine whether this crime spree satisfies the requirements for ongoing criminal conduct.

## I. Factual Background and Proceedings.

We recite the facts in the light most favorable to the prosecution in considering Crawford's challenge to the sufficiency of the evidence to support his convictions. *See State v. Taylor*, 689 N.W.2d 116, 131 (Iowa 2004).

Most of the State's evidence at trial came from the testimony of Ethan Spray, who participated in the underlying crimes with Crawford and provided his testimony in exchange for a plea deal. According to Spray, on May 30, 2018, he and his associates, Ross Thornton and Jordan Crawford, cut into an ATM using an acetylene torch. It is unclear whether they were successful in recovering cash from the ATM, but Crawford was not charged related to that incident even though Spray identified Crawford as the one operating the torch. In any event, the trio's alleged crime spree did not stop with the ATM in Brighton. On June 1, Spray robbed the Pilot Grove Savings Bank in Packwood, Iowa at gunpoint. He left the bank with approximately $18,000 in cash and jumped into a getaway car driven by Thornton.

Earlier that morning, Thornton drove his pickup truck to Packwood and parked it a few miles outside of town. The pickup truck driven by Thornton was registered to Crawford. Phone records obtained in the ensuing investigation revealed that during the robbery, Thornton communicated with Crawford, who was waiting at the Ottumwa residence he shared with Thornton. The roommates exchanged five phone calls during a twenty-two-minute interval surrounding the commission of the robbery.

Spray testified that Crawford was supposed to provide him with a face mask or a hat[1] and gloves to wear during the robbery. Crawford supplied the face mask as directed; however, he forgot the gloves, forcing Spray to cover the distinctive tattoos on his hands with duct tape instead. After the robbery, the group removed and burned paper bands that were holding the stolen money together, along with the two-dollar bills they thought could be traced back to the bank. When asked if Crawford helped, Spray testified, "Barely. He was in and out of the room." Spray identified Thornton as the leader of the group who kept the money from the robbery. Spray testified the three men had an understanding as to how the money was going to be used, but he never stated what the understanding was.

Within days of the robbery, the trio continued their crime spree by taking a trip to the West Coast to purchase marijuana they intended to sell back in Iowa. Investigators were able to later follow their movements cross-country

---

[1]Spray's testimony never clarified whether Crawford gave him a hat or a face mask. For brevity, we will refer to the item as a mask.

through Spray's cell phone records. Facebook messages sent from Crawford's account show his attempts to purchase marijuana in Oregon. The messages also show Crawford soliciting numerous Facebook contacts upon returning to Iowa, advertising that he "just got back from Oregon and got that fire green for the low". The Facebook messages took place right after the robbery and continued until June 15.

When the trio arrived home from their trip out west, law enforcement was busy investigating the bank robbery. The investigation ultimately led them back to Spray based on the identification of his vehicle, physical descriptions of him from witnesses, and surveillance footage matching his appearance. Law enforcement executed search warrants in August for the homes of Spray, Thornton, and Crawford, and for Crawford's vehicle. They found $50,000–$55,000 of cash at Thornton's home. Officers found a handwritten note in Spray's home that read, "Im Freaking out Feds are onto us!! Do you know how to look for wire taps and bugs?" The officers found no incriminating evidence at Crawford's home but did find $470 in cash, two phones, and a "personal use" amount of marijuana in Crawford's vehicle. The $470 was never linked back to the robbery. Crawford's employer testified that he had recently paid Crawford over $1,200, and Crawford argued that the cash in his car was from his paycheck.

Ultimately, Crawford was charged with aiding and abetting the Packwood bank robbery in violation of Iowa Code sections 711.1(1) and 711.2, and section 703.1 (2019), a class "B" felony. Although Crawford was not charged with the

attempted ATM theft or distribution of marijuana, the prosecutor used those alleged crimes, along with the Packwood robbery, to file an amended trial information adding a charge of ongoing criminal conduct in violation of Iowa Code sections 706A.2(1)(*d*) and 706A.1(5), also a class "B" felony.

The jury found Crawford guilty on both counts. Crawford appealed, arguing that the evidence was insufficient to support either conviction. We transferred the case to the court of appeals. The court of appeals rejected Crawford's arguments and affirmed his conviction for both robbery in the first degree and ongoing criminal conduct. We granted Crawford's application for further review.

## II. Standard of Review.

We review sufficiency of the evidence claims for correction of errors at law. *State v. Kelso-Christy*, 911 N.W.2d 663, 666 (Iowa 2018). When evaluating the sufficiency of the evidence, we consider "whether, taken in the light most favorable to the State, the finding of guilt is supported by substantial evidence in the record." *Id.* (quoting *State v. Meyers*, 799 N.W.2d 132, 138 (Iowa 2011)). There is substantial evidence if the evidence "would convince a rational fact finder the defendant is guilty beyond a reasonable doubt." *Id.* (quoting *Meyers*, 799 N.W.2d at 138). We draw all legitimate inferences in support of the verdict. *Taylor*, 689 N.W.2d at 131. However, "[e]vidence which merely raises suspicion, speculation, or conjecture is insufficient." *State v. Casady*, 491 N.W.2d 782, 787 (Iowa 1992) (en banc). The evidence must at least raise a fair inference of guilt

as to each essential element of the crime. *State v. LaPointe*, 418 N.W.2d 49, 51 (Iowa 1988).

### III. Error Preservation.

At the close of the State's case, Crawford made a motion for acquittal and renewed the motion before the case was submitted to the jury. As the State points out, Crawford's motion for acquittal did not specifically identify which elements of the first-degree robbery charge the evidence failed to prove, and he never mentioned a lack of evidence about his knowledge that a weapon would be used. Applying our precedent, the court of appeals agreed with the State that Crawford failed to preserve error on his challenge to the first-degree robbery conviction.

But after the court of appeals decision, we revisited our precedent concerning what is needed to preserve a challenge to the sufficiency of the evidence following a trial. *See State v. Crawford*, 972 N.W.2d 189, 195–202 (Iowa 2022). In *State v. Crawford*, we held, "A defendant's trial and the imposition of sentence following a guilty verdict are sufficient to preserve error with respect to any challenge to the sufficiency of the evidence raised on direct appeal." *Id.* at 202. Therefore, we may review Crawford's challenge to the sufficiency of the evidence for both charges in this case, despite any deficiencies in his motion for acquittal.

### IV. Analysis.

We consider two issues on appeal: (1) whether there was sufficient evidence to convict Crawford of robbery under an aiding and abetting theory and

(2) whether there was sufficient evidence to convict Crawford of committing ongoing criminal conduct.

**A. Aiding and Abetting.** Sufficient evidence to support a conviction under a theory of aiding and abetting exists if there is "substantial evidence the accused assented to or lent countenance and approval to the criminal act by either actively participating or encouraging it prior to or at the time of its commission." *State v. Hearn*, 797 N.W.2d 577, 580 (Iowa 2011) (quoting *State v. Ramirez*, 616 N.W.2d 587, 591–92 (Iowa 2000) (en banc), *overruled on other grounds by State v. Reeves*, 636 N.W.2d 22, 25–26 (Iowa 2001)). Knowledge of the crime is essential; "however, neither knowledge nor presence at the scene of the crime is sufficient to prove aiding and abetting." *State v. Barnes*, 204 N.W.2d 827, 828 (Iowa 1972). "Aiding and abetting may be proven by direct or circumstantial evidence. Direct and circumstantial evidence are equally probative." *State v. Huser*, 894 N.W.2d 472, 491 (Iowa 2017) (citation omitted).

The jury was instructed on both first- and second-degree robbery, and it found Crawford guilty of robbery in the first degree. Crawford challenges the evidence to support a conviction for any robbery. We start with first-degree robbery.

1. *First-degree robbery.* A person who "purposely inflicts or attempts to inflict serious injury, or is armed with a dangerous weapon" during a robbery commits first-degree robbery; all other robberies are second-degree robbery. Iowa Code §§ 711.2–.3. The jury instructions required the State to prove the following elements of first-degree robbery:

1. On or about the 1st day of June, 2018, the defendant had the specific intent to commit a theft, either as principal or as aider and abettor.

2. To carry out his intention or to assist another to commit the theft or to escape from the scene, with or without the stolen property, the defendant aided and abetted another in the robbery of the Pilot Grove Savings Bank, during which time Darrell Hoehne was threatened with, or purposefully placed in immediate fear of serious injury.

3. The defendant aided and abetted another who was armed with a dangerous weapon.

"[I]n the context of a first-degree robbery prosecution under the dangerous weapon alternative, the State must prove the alleged aider and abettor had knowledge that a dangerous weapon would be or was being used." *State v. Henderson*, 908 N.W.2d 868, 876 (Iowa 2018). "Otherwise, the aider and abettor may have knowledge or intent to commit a robbery, but not first-degree robbery." *Id.*

Crawford argues the State failed to produce evidence showing he knew Spray would be armed when he committed the robbery. To this point, Spray testified that Crawford had nothing to do with the gun. The State produced no other evidence concerning Crawford's knowledge about Spray's use of a weapon. The State concedes that the record lacked evidence tending to prove Crawford knew Spray would use a gun, resisting Crawford's appeal of his conviction for first-degree robbery only on preservation grounds. *Crawford* resolved any potential error preservation issues, and we reject the State's argument. *See* 972 N.W.2d 189 at 202. We set aside Crawford's conviction on the first-degree robbery charge because the State failed to offer any evidence to satisfy the

dangerous weapon element of first-degree robbery. *See Henderson*, 908 N.W.2d at 876.

2. *Second-degree robbery.* Even though the jury did not return a guilty verdict for second-degree robbery, having found Crawford guilty of first-degree robbery, the jury was instructed that if it found the first two elements, but not the dangerous weapon element, it should find Crawford guilty of the lesser included offense of second-degree robbery.

Crawford argues that the State failed to offer sufficient evidence that he possessed the specific intent to commit the robbery, the second element listed in the jury instructions. Specifically, Crawford argues that the State failed to prove that he provided Spray with the mask with the specific intent it would be used in the robbery. The State counters that supplying the mask, coupled with phone records showing his contemporaneous communications with Thornton who was driving Crawford's truck, allowed the jury to infer Crawford's intent to assist in completing the crime. Intent can seldom be proved by direct evidence. *See State v. Olson*, 373 N.W.2d 135, 136 (Iowa 1985). Consequently, proof of intent usually arises from circumstantial evidence and inferences reasonably drawn from the circumstances. *See id.*

Aiding and abetting means to "assent[] to or len[d] countenance and approval to the criminal act by either actively participating or encouraging it prior to or at the time of its commission." *Ramirez*, 616 N.W.2d at 591–92. The most incriminating evidence offered by the State was the direct testimony by Spray as to Crawford's involvement in the plan to commit, and subsequently

conceal, the Packwood bank robbery. But a conviction cannot be based solely on the testimony of an accomplice; it must be corroborated by other evidence that demonstrates a connection between the defendant and the commission of the crime. *See* Iowa R. Crim. P. 2.21(3). "Corroborative evidence need not be strong as long as it can fairly be said that it tends to connect the accused with the commission of the crime and supports the credibility of the accomplice." *State v. Barnes*, 791 N.W.2d 817, 824 (Iowa 2010) (quoting *State v. Berney*, 378 N.W.2d 915, 918 (Iowa 1985), *overruled on other grounds by State v. Bruce*, 795 N.W.2d 1 (Iowa 2011)). Phone records offered by the State showed Crawford called Thornton, who drove Crawford's truck to commit the crime, five times immediately before and after the robbery. These independent records sufficiently corroborate Spray's testimony about Crawford's involvement in the crime.

The State also points to evidence of Crawford's conduct after the robbery, which allowed the jury to infer his participation in the scheme and establish intent. Evidence of a defendant's " 'presence, companionship, and conduct before and after the offense is committed' may be enough from which to infer a defendant's participation in the crime." *State v. Lewis*, 514 N.W.2d 63, 66 (Iowa 1994) (quoting *State v. Miles*, 346 N.W.2d 517, 520 (Iowa 1984)). Crawford helped burn the money bands after Spray and Thornton returned to the house Crawford shared with Thornton, which provides additional evidence to support a reasonable inference he intended to participate in the robbery.

The evidence against Crawford is similar to what we have found sufficient in other cases to support an aiding and abetting robbery conviction. In *State v.*

*Hearn*, we upheld a conviction for aiding and abetting second-degree robbery based on evidence that the defendant was with his brother and cousin shortly before a carjacking, the defendant admitted to police he knew the people in the stolen car after it crashed, and he drove another car in an attempt to help the carjackers escape, at one point swerving at a police car. 797 N.W.2d at 580–81. Evidence of the defendant's actions before and after the carjacking provided substantial evidence to support the verdict by allowing the jury to infer the defendant's involvement. *Id.* We reached a similar conclusion in *State v. Jefferson*, 574 N.W.2d 268, 277 (Iowa 1997). In that case, evidence that the defendant drove to a convenience store with the gunman, parked in an inconvenient location behind the store, failed to intervene or protest when the gunman demanded money and forced the clerk into the back of the store, and then left with the gunman provided circumstantial evidence to support the jury's rejection of the defendant's testimony that he thought they were just stopping for directions. *Id.* Here, the State presented evidence comparable to that found sufficient to establish aiding and abetting second-degree robbery in *Hearn* and *Jefferson*.

We reverse Crawford's conviction for robbery in the first degree and remand for the district court to enter judgment and sentence on the lesser included offense of robbery in the second degree. *See Henderson*, 908 N.W.2d at 878–79; *State v. Ortiz*, 905 N.W.2d 174, 182–83 (Iowa 2017) (remanding to the district court to enter judgment and resentence on the lesser included offense of third-degree robbery when there was sufficient evidence to support a finding of

third-degree robbery but insufficient evidence to support second-degree robbery).

**B. Ongoing Criminal Conduct.** Crawford was also convicted of violating Iowa Code section 706A.2(1), the criminal enterprise prong of Iowa's ongoing criminal conduct statute. As relevant to Crawford's conviction, it is unlawful for a person to: (1) knowingly conduct or participate in the affairs of an enterprise (2) through "specified unlawful activity" (3) on a continuing basis. *Id.* § 706A.2(1)(*c*). The State's theory at trial was that Crawford, Spray, and Thornton engaged in an enterprise to steal money from the ATM in Brighton and the Pilot Grove Savings Bank in Packwood and use the stolen money to finance a drug operation by purchasing marijuana in Oregon and reselling it in Iowa. Crawford does not dispute that his involvement with Spray and Thornton could comprise an enterprise, so we focus on the other two elements of the offense.

To place Crawford's conviction in context, we note that Iowa's ongoing criminal conduct statute was "patterned after the Model Ongoing Criminal Conduct Act, which was part of the Report of the President's Commission on Model State Drug Laws in 1993." *State v. Olsen*, 618 N.W.2d 346, 348 & n.1 (Iowa 2000) (en banc) (noting Iowa as the only state to have enacted an ongoing criminal conduct statute). The goal of the model act was to "defend legitimate commerce from organized criminal activity and remedy the economic effects of crime." *Id.* Likewise, "the paramount purpose of Iowa's ongoing criminal conduct statute is, like the model act, to combat criminal networks and enterprises." *Id.* at 350 ("This is evident from the overall framework of the statute.").

The statute is built around the phrase "specified unlawful activity." But where the model act limits that definition "to racketeering offenses or offenses that represent the key components of ongoing criminal networks," the Iowa statute broadly applies the phrase to "any indictable offense, limited only to those offenses 'committed for financial gain on a continuing basis.'" *Id.* (quoting Iowa Code § 706A.1(5)). The continuing basis requirement serves to limit the statute's reach to a course of organized or planned ongoing illegal activity as opposed to merely isolated criminal acts. *See State v. Reed*, 618 N.W.2d 327, 334–35 (Iowa 2000) (en banc). A conviction is a class "B" felony, subjecting a defendant to a twenty-five-year prison term that can be run consecutive to convictions for the underlying predicate offenses. *See* Iowa Code § 706A.4; *id.* § 902.9(1)(*b*); *see also* Anna T. Stoeffler, Note, *Iowa's State RICO Statute: Wreaking Havoc on Iowa's Criminal Justice System*, 102 Iowa L. Rev. 825, 833 (2017) (discussing the breadth of activity covered by the Iowa ongoing criminal conduct statute relative to other state RICO statutes and cautioning that "a conviction under the IOCCA adds substantial time to the sentence for a defendant's predicate offense").

Crawford argues that the State failed to produce substantial evidence that he participated in "specified unlawful activity" as defined by the statute or that the illegal activities met the "continuing basis" requirement. These are distinct terms with specialized meanings.

Crawford first challenges the State's evidence to support the "specified unlawful activities" element of an ongoing criminal conduct charge. The State relied on the following activities: (1) the theft of money from the Brighton ATM;

(2) the robbery of the Pilot Grove Savings Bank in Packwood; and (3) the distribution, either attempted or completed, of marijuana. Crawford argues that Jury Instruction No. 27, which defined "specified unlawful activity," required the activity to be an "indictable offense" and attempted distribution of marijuana is not an indictable offense in any state. The State counters with Jury Instruction No. 25, which expressly identified the "specified unlawful activities" the jury could rely on: "to wit: a) the theft of money from the Brighton, Iowa ATM; and/or b) the robbery of the Pilot Grove Savings in Packwood, Iowa Bank; and/or c) the distribution, either attempted or completed, of marijuana." And since Crawford did not object to the instruction, the State argues he cannot now complain that attempted distribution does not satisfy the specified unlawful activity element of his conviction. *See State v. Canal,* 773 N.W.2d 528, 530 (Iowa 2009) (explaining that when a defendant does not "object to the instructions given to the jury at trial . . . the jury instructions become the law of the case for purposes of our review of the record for sufficiency of the evidence").

The parties correctly point out the contradictions between the two jury instructions, so looking just to the instructions as the State argues does not simplify the analysis. In the end, we do not need to reconcile these inconsistencies in light of our conclusion that there was insufficient evidence to meet the separate continuing basis requirement for Crawford's ongoing criminal conduct conviction. We turn to that element instead.

Crawford argues the State failed to show that the specified unlawful activity was conducted on a "continuing basis." The State again argues that we

are limited to the jury instructions, which do not otherwise define the term "continuing basis," because Crawford did not offer an instruction that explained the legal requirements for a continuing basis. The problem with the State's argument is that it cannot point to an *incorrect* statement of the law in the jury instructions with respect to the continuing basis requirement to which Crawford was required to object. Our law of the case doctrine is premised on the failure to object to an incorrect statement of the law. *See, e.g., State v. Harris*, 891 N.W.2d 182, 188 (Iowa 2017) (holding that counsel's failure to object to jury instruction that omitted "going" element of offense of "going armed with intent" constituted ineffective assistance); *State v. Hopkins*, 576 N.W.2d 374, 378–80 (Iowa 1998) (counsel was ineffective for failing to object to an instruction that was not "a correct statement of the law"). If a party fails to alert the district court of the erroneous instructions, he cannot complain that the evidence was insufficient to support a legal proposition contrary to the one instructed to the jury. When that happens, we apply the law as set out in the instructions rather than the applicable law. *See, e.g., Canal*, 773 N.W.2d at 530 ("[The defendant] did not object to the instructions given to the jury at trial. Therefore, the jury instructions become the law of the case for purposes of our review of the record for sufficiency of the evidence.").

But failing to fully define a term is a different matter. The State does not dispute that Jury Instruction No. 25 and Jury Instruction No. 27 both required the jury to find that the underlying acts were committed on a continuing basis, a required element of the offense. The failure of the instructions to further

elucidate what that term means does not prevent us from applying the correct law. *See, e.g.*, *State v. Banes*, 910 N.W.2d 634, 639–41 (Iowa Ct. App. 2018) (addressing whether evidence was sufficient to support finding of continuing basis as described in *State v. Reed* although the term was not further defined).

In *State v. Reed*, we considered what it means for specified unlawful activities to be committed on a continuing basis under Iowa Code chapter 706A, which does not define the phrase. 618 N.W.2d at 334. Given the similarities between the underlying purposes of chapter 706A and the Federal Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c), we adopted the United States Supreme Court's interpretation of "a pattern of racketeering activity" as a reasonable interpretation of "continuing basis" for purposes of chapter 706A. *See Reed*, 618 N.W.2d at 334–35 (discussing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241–42 (1989)). As a general matter, continuing basis means that there must be a sufficient series of related predicate acts over a significant period of time or, alternatively, "conduct that by its nature projects into the future with a threat of repetition." *Id.* (quoting *Midwest Heritage Bank, FSB v. Northway*, 576 N.W.2d 588, 591 (Iowa 1998)).

" '[C]ontinuing basis' in section 706A.1(5) requires proof of a course of criminal activity as opposed to an isolated or one-time act." *Id.* at 334. To be considered part of an enterprise conducted on a continuing basis, the predicate acts must be related in some way and have an element of continuity. *Id.* ("It is this factor of continuity plus relationship which combines to produce a 'pattern.' " (quoting *Midwest Heritage Bank*, 576 N.W.2d at 591)). The

relationship element "can be shown if the predicate acts 'have the same or similar purposes, results, participants, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " *Id.* (quoting *Midwest Heritage Bank*, 576 N.W.2d at 591). Crawford does not argue that the State failed to show a relationship between the predicate acts of robbing banks and using the stolen funds to fund a drug distribution operation, so our analysis is focused on the continuity element.

Requiring continuity helps distinguish between isolated events and a plan of continuing illegal activity. The focus of the statute is the ongoing nature of planned illegal conduct. Continuity can be shown by either an "open-ended" or "closed-ended" concept. *Id.* at 334–35. Continuity refers "either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. It is, in either case, centrally a temporal concept." *Id.* (quoting *Midwest Heritage Bank*, 576 N.W.2d at 591). Crawford argues the evidence was insufficient to show continuity based on either concept.

1. *Closed-ended continuity.* The point of requiring a continuing basis is to show the ongoing nature of the criminal conduct. Illegal activities don't have to go on forever to meet the continuing basis requirement. At the same time, committing a few illegal activities over a short period of time does not indicate an intent to commit illegal activities on a continuing basis. To avoid sweeping in multiple, but isolated acts, a closed period of repeated conduct must occur over a substantial time period before it establishes the activities were committed on a continuing basis. *See id.* at 334.

The State argues that the attempted ATM theft, the bank robbery, and attempts to buy and sell marijuana satisfy the closed-ended concept. The jury instructions identified the time period as May 29, 2018, to June 15, 2018, less than three weeks. In *Reed*, we recognized that without a threat of future criminal conduct, predicate acts extending over a few weeks or months are insufficient for establishing continuity. *Id.* at 335. That is because the ongoing criminal conduct statute, like RICO, is concerned with "long-term criminal conduct." *Id.* (quoting *Midwest Heritage Bank*, 576 N.W.2d at 591).

This conclusion is supported by federal cases considering the length of time necessary to satisfy a closed-ended concept of continuity for purposes of RICO. *See, e.g.*, *Wisdom v. First Midwest Bank, of Poplar Bluff*, 167 F.3d 402, 407 (8th Cir. 1999) (holding six-month period too short to satisfy the closed-ended analysis of the continuity requirement); *Primary Care Invs., Seven, Inc. v. PHP Healthcare Corp.*, 986 F.2d 1208, 1215–16 (8th Cir. 1993) (holding eleven months insufficient to satisfy the closed-ended continuity requirement and noting that other federal circuit courts consistently hold that schemes less than one year are too short). It is also consistent with the length of time this court and the court of appeals have considered sufficient to satisfy the continuing basis requirement of an ongoing criminal conduct charge. *Compare Olsen*, 618 N.W.2d at 347 (a scheme to defraud an elderly couple out of $200,000 through a home repair scam over a period of nineteen months supported ongoing criminal conduct conviction), *State v. Schindler*, No. 19–0138, 2020 WL 2487607, at *2–3 (Iowa Ct. App. May 13, 2020) (twenty-four thefts over three years satisfied closed

period of continuity), *State v. Wulf*, No. 18–0398, 2019 WL 720469, at *4 (Iowa Ct. App. Feb. 20, 2019) (multiple acts of theft over the course of a year showed continuity over closed period of repeated conduct), *and State v. Frey*, No. 05–0287, 2006 WL 2872492, at *2 (Iowa Ct. App. Oct. 11, 2006) (multiple predicate acts over a period of almost three years satisfied closed period of continuity), *with Reed*, 618 N.W.2d at 333–34 (three drug sales in two months failed to establish closed-ended continuity), *State v. Goodwin*, No. 18–1822, 2020 WL 1551149, at *5–7 (Iowa Ct. App. Apr. 1, 2020) (five robberies over three days did not satisfy continuity requirement), *Banes*, 910 N.W.2d at 640–41 (three commercial burglaries over the span of one month insufficient to meet continuity requirement), *and State v. Agee*, No. 02–0967, 2003 WL 22087479, at *2 (Iowa Ct. App. Sept. 10, 2003) (five counts of forgery over eight days did not satisfy continuity requirement).

The three-week period between the attempt to cut into the Brighton ATM and the last Facebook post about selling marijuana clearly does not satisfy the substantial time period required by *Reed*. 618 N.W.2d at 334–35. Therefore, the evidence is insufficient to establish the continuing basis element of ongoing criminal conduct under the closed-ended concept.

2. *Open-ended continuity.* "[A] continuing basis may be found, even where predicate acts occur over a short period of time, if there is a demonstrated relationship between the predicate acts and a threat of continuing criminal activity." *Banes*, 910 N.W.2d at 640–41 (alteration in original) (quoting *Agee*, 2003 WL 22087479, at *2). This is referred to as the open-ended theory of

continuity. An open-ended time period is demonstrated by "past conduct that by its nature projects into the future with a threat of repetition." *Reed*, 618 N.W.2d at 334 (quoting *Midwest Heritage Bank*, 576 N.W.2d at 591). Under an open-ended theory, "liability depends on whether the threat of continuity is demonstrated." *Id.* at 335 (emphasis omitted) (quoting *Midwest Heritage Bank*, 576 N.W.2d at 591). This requires "a realistic prospect of continuity over an open-ended period yet to come." *Home Orthopedics Corp. v. Rodríguez*, 781 F.3d 521, 531 (1st Cir. 2015) (quoting *Feinstein v. Resol. Tr. Corp.*, 942 F.2d 34, 45 (1st Cir. 1991)) (discussing open-ended continuity under RICO).

There are two general scenarios where the continuity requirement is satisfied through open-ended conduct. One arises where there is evidence that the illegal activity would have continued for a sufficient time to meet the closed-ended time period but the defendant's conduct was cut short, generally by an arrest or other law enforcement intervention. The other is where the nature of the illegal activity itself reveals an intent for the illegal activities to continue.

*Reed* provides an example of the first scenario. Reed committed "at least three completed offenses of dealing drugs over a two-month period," but his drug dealing ended when he was arrested. 618 N.W.2d at 335. The two-month period was too short to support closed-ended continuity, so we considered the nature of Reed's illegal activity to determine whether there was evidence that, had Reed not been arrested, he would have continued his illegal drug trade. *Id.* at 334–35. We concluded that evidence of a dealer quantity of drugs seized from the defendant along with evidence that he made monthly payments to store his drug

stash at someone else's house were sufficient to show that Reed intended to continue dealing drugs if not caught. *Id.*

*State v. Banes* provides a proper contrast to *Reed*. In *Banes*, the defendant was convicted of burglary, theft, and criminal mischief after he and a friend broke into two different businesses in Lee County on Christmas Day and a third business a few days later. 910 N.W.2d at 637–39. They stole tools, guns, clothes, jewelry, and electronic equipment and then sold some of the stolen items to a third party. *Id.* at 637–38. A week later, one of the business owners, who suspected Banes was involved, saw him driving in Keokuk and chased him, calling the police along the way. *Id.* at 638. The police found Banes's jeep abandoned at his grandfather's house with some of the stolen items inside. *Id.* In overturning Banes's separate conviction for ongoing criminal conduct, the court of appeals recognized that committing several commercial burglaries over a period of a few days could not satisfy the requirement for evidence of a continued threat of future criminal conduct. *Id.* at 641. Nor was that requirement satisfied by the fact that the defendant was unemployed. *Id.* Whereas being unemployed does not itself indicate a defendant intends to continue to support himself through illegal activity, *id.*, paying someone on a monthly basis to stash drugs does indicate the defendant intends to continue selling drugs, *Reed*, 618 N.W.2d at 334–35.

Evidence that an otherwise unemployed defendant makes a living through criminal activity might provide evidence to support a threat of continuing activity, but being unemployed in and of itself does not. *Banes*, 910 N.W.2d at

641. We think the same is true for selling drugs. That a defendant engages in more than one drug sale does not, in and of itself, establish the evidence needed to support a finding of a threat of continuing illegal conduct into the future. If it was, the three sales of drugs in *Reed* would have been enough to support the ongoing criminal conduct conviction and we would not have needed to rely on the monthly payments for a stash house to establish a continued threat of future criminal conduct. The statute criminalizes an intentional scheme of ongoing criminal conduct, not merely a series of isolated criminal acts that may or may not continue into the future. *See Reed*, 618 N.W.2d at 334–35 (noting the statute does not cover isolated criminal activity).

Here, the State relies on evidence that Crawford communicated with a number of people through Facebook to make multiple marijuana sales, arguing this reveals an ongoing drug-dealing operation. But *Reed* makes clear that multiple drug sales over a short period of time are insufficient without additional evidence to support a threat of continuing illegal activity. The State's evidence of drug sales through Facebook only shows activity through June 15; there is no evidence that sales continued beyond that point.

The State relies on evidence that Spray and Thornton feared the police were on to them based on a note found in Spray's house during execution of the August search warrant to argue that the illegal activity was cut short by law enforcement. We reject this argument for two reasons. First, as in *Reed*, there must still be evidence beyond the prior short-lived drug sales to support a finding of a threat of continuing illegal activity, even when there is an explanation for an

end to the illegal activity. The State's case is lacking that additional piece of evidence we found crucial in *Reed*.

Second, the note was not found until August, at least six weeks after the last evidence of any drug sales, and Crawford was not arrested until nearly a year later. Yet, the State presented no evidence that he continued any illegal activities during the interim—before or after execution of the August search warrants through the time of his arrest. Instead, the evidence revealed he was gainfully employed and possessed only a user quantity of marijuana. While courts have excused the lack of continuing illegal activity when it is stopped by law enforcement, the rationale of those cases does not extend to the facts here. The defendant in *Reed* was arrested just one day after selling drugs to a confidential informant, his third predicate offense, but the evidence of renting a stash house revealed he would have continued selling but for the arrest. 618 N.W.2d at 330, 335; *see also United States v. Torres*, 191 F.3d 799, 807–08 (7th Cir. 1999) (four acts of kidnapping over a short period of time as efforts to collect drug debts supported RICO charges as part of a larger plan that was halted only upon the participants' arrests). Here, we have the opposite. Investigators found over $50,000 in cash at Thornton's house but never found dealer quantities of marijuana. It is just as likely that the three had sold all of the drugs they bought in Oregon, ending their crime spree. That the co-conspirators may have laid low to avoid arrest cannot be used to excuse the lack of any evidence of ongoing illegal activity.

While the nature of the illegal activity itself can reveal an intent for the illegal activities to continue, this is not such a case. The Supreme Court has found the necessary threat of continuity when the illegal "acts themselves include a specific threat of repetition extending indefinitely into the future." *H.J. Inc.*, 492 U.S. at 242–43 (giving as an example a neighborhood hoodlum who offers to provide "insurance" against vandalism to area businesses in exchange for a "premium"). Relatedly, "the threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *Id.* at 242. We do not have that here. *See, e.g.*, *United States v. Browne*, 505 F.3d 1229, 1263 (11th Cir. 2007) (holding evidence sufficiently satisfied the threat prong of open-ended continuity because the predicate acts of fraud were part of the defendant's "regular way of doing business"); United *States v. Simmons*, 923 F.2d 934, 950–52 (2d Cir. 1991) (holding that evidence indicating the murders were intended to maintain discipline in a narcotics operation was sufficient to show the acts threatened repetition by their nature). Spray testified that at the time the trio was committing their alleged crime spree, he was using $100 of methamphetamines a day. He even admitted to smoking methamphetamines just two hours before the bank robbery. These facts are more indicative of a drug-induced crime frenzy than a regimented criminal operation that displayed no signs of stopping.

At most, the State proved a plan to steal from an ATM and rob a bank, use the proceeds to purchase drugs out west, and then resell them in Iowa, a plan that was carried out over a period of three weeks. But there is no evidence the

coconspirators had a plan to continue that pattern once the initial drugs ran out. *See, e.g., Banes*, 910 N.W.2d at 641 ("Both Vawter and Banes testified at trial, and neither testified regarding any plan for future conduct."). Without evidence of a plan to continue the illegal conduct beyond the last attempted June 15 marijuana sale, the State presented insufficient evidence to establish the continuing basis element of the ongoing criminal conduct charge. Crawford's conviction for ongoing criminal conduct cannot stand.

### V. Disposition.

We vacate Crawford's conviction and sentence for ongoing criminal conduct. We also vacate Crawford's conviction for robbery in the first degree and remand for entry of judgment and sentencing for robbery in the second degree.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT OF CONVICTION REVERSED, SENTENCE VACATED, AND REMANDED FOR RESENTENCING.**